# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

OCTOBER TERM, 1910.

---

JAMES C. McGREW v. MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

In Banc, November 12, 1910.

1. **INVALIDITY OF STATUTE: Raised for First Time on Appeal.** Where plaintiff's cause of action is founded upon a statute, defendant may for the first time on appeal raise the question of the constitutionality and validity of that statute. The validity of the statute is in the case at all times, because if it is not valid plaintiff has no cause of action, and defendant at every stage of the proceeding has a right to object that the petition does not state a cause of action.

2. ————: **Title: Discrimination in Freight Rates.** A statute which prohibits every railroad company in the State from (1) charging for the transportation of property for any distance over its road any larger amount as compensation than is charged by it for the transportation of similar quantities of the same class of property a greater distance over its road; (2) from charging different rates for receiving, handling or delivering freight at different points on its road, or any road used by it in connection therewith; and (3) from charging for the transportation of property over any portion of its road a greater

(496)  [230 Sup.

amount as compensation than is charged by it for the transportation of similar quantities of the same class of property over any other portion of its road of equal distance, is not broader than its title, which is: "An act to prevent unjust discrimination and extortion in the rates to be charged by the different railroads in this State, for the transportation of freight on said road." It cannot be successfully contended that the title contemplates only unjust discrimination, and the act all discriminations whether just or unjust. The body of the act does not prohibit all discriminations; it does not prohibit just discriminations. It denounces three discriminations, thereby pronounces them unjust, and prohibits them. The title plainly indicated that the body of the act would specify what discriminations were unjust, and not leave it to the courts to sift out just from unjust discriminations.

> *Held*, ·by WOODSON, J., dissenting, that the title contemplates only unjust discriminations, and the body of the act, if it refers to discriminations at all, prohibits all discriminations, whether just or unjust; and if it does not embrace discriminations but refers solely to long and short hauls, then it is a clear departure from the title of the act, and is therefore void, because its subject is not expressed in the title.

3. ———: ———: ———: Penalty: Declaratory of Common Law. Nor does such title contemplate a statute simply declaratory of the common law, and limiting discriminations to individuals (and not embracing localities) as the common law seems to do, and spending itself wholly in fixing penalties for such discriminations as were at common law unjust. On the contrary, the title says, "An Act to *prevent* unjust discriminations," etc.

4. ———: Contrary to Subsequent Constitution. An act valid under the Constitution of 1865 became invalid upon the adoption of the Constitution of 1875 if the provisions of the act are in conflict with provisions of that later Constitution.

5. ———: Unjust Discrimination: Constitutional Inhibitions: Expressio Unius, Etc. The Constitution in declaring in section 14 of article 12 that "the General Assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads of this State," directed the Legislature to enact laws preventing unjust discriminations, but did not restrict its powers to prohibit any discriminations not otherwise by the Constitution of the State or of the United States prohibited or limited. The rule of *expressio unius exclusio alterius est* cannot be applied strictly to legislative powers, and especially is that

McGrew v. Railroad.

true when such command is read, as it must be, in connection with section 12, which says that "it shall not be lawful in this State for any railway company to charge for freight or passengers a greater amount, for the transportation of the same, for a less distance than the amount charged for any greater distance; and suitable laws shall be passed by the General Assembly to enforce this provision." The legislative power of the State is unlimited except as restricted by the State or Federal Constitution; and the enumeration of certain powers in the State Constitution is not to be held to be a denial of other legislative powers in the State.

*Held,* by WOODSON, J., dissenting, that if the Act of 1872 was intended to prohibit both just and unjust discrimination, it was abrogated and annulled by said sections 12 and 14 of the Constitution, for those two sections, when read together, were intended to mean a direction to the Legislature to enact laws that would prevent the abuses therein mentioned, namely, unjust discriminations and extortions in freight and passenger rates, and were never intended to be understood as giving the Legislature an unrestricted power to abolish all discriminations, whether just or unjust, reasonable or unreasonable. Section 12 literally construed seems to prohibit all discriminations, but if that is its meaning it is in irreconcilable conflict with section 14; but if the words in section 12, namely, "It shall not be lawful for any railway company to charge for freight or passengers a greater amount, for the transportation of the same, for a less distance than the amount charged for a greater distance," are held to mean the "unjust discrimination and extortion in the rates of freight and passenger tariffs" denounced by section 14, then the two sections are brought into harmony; and that meaning is in harmony with the prior decisions of the courts, and the other provision of section 12, namely, "Suitable laws shall be passed by the General Assembly to enforce this provision."

6. ——: ——: ——: Illinois Construction. The Act of 1872 prohibiting the charging of different rates for the transportation of the same class of freight equal distances over a railroad, and from charging for the transportation over any portion of the road a greater amount than is charged for the transportation of similar quantities of the same class of property over any other portion of the road of equal distance, and making a violation thereof an unjust discrimination, was a valid act under the Constitution of 1865. And the fact that the Supreme Court of Illinois declared a similar statute to be in conflict with a provision of the Illinois Constitution which was the same as section 14 of article 12 of our Constitution of 1875, subsequently adopted, in that the constitutional provision invested

the courts with the power to determine what is an unjust discrimination, and took that power away from the Legislature, as the Act of 1872 did, does not make the Illinois interpretation of its similar statute binding on this State, for the said section 14 of article 12 of our Constitution is to be read in connection with section 12, and said section 12 destroyed the effect of the Illinois construction of their constitutional provision similar to our section 14, and inhibited all discriminations, just or unjust.

7. ————: ————: **Judicial Questions.** Under section 12 of article 12 of our Constitution, declaring that "it shall not be lawful in this State for any railway company to charge for freight or passengers a greater amount, for the transportation of the same, for a less distance than the amount charged for any greater distance; and suitable laws shall be passed by the General Assembly to enforce this provision," the determination of whether a short-haul discrimination in freight charges is just or unjust, is not a judicial question. It can become such only when the rates fixed by statute as a whole result in the confiscation of the railroad properties by the public.

8. ————: ————: ————: **Constitutional Right: Reasonable Compensation.** A railroad company has no constitutional right to discriminate between either individuals or localities, and under the U. S. Constitution the State has the constitutional power to prohibit all such discriminations. A railroad company does not have the same right to a decision of the courts upon the question as to what is just discrimination that they have upon the question as to what is reasonable compensation for property taken for public use or for the use of property already devoted to public use. A declaration by the legislative power of the State that any discriminations in freight charges are unjust, as the State has declared in the Act of 1872 and section 12 of article 12 of its Constitution, is not in conflict with section 1 of article 14 of the Amendments to the U. S. Constitution, and that section, in reference to due process of law, has no application to such a declaration.

9. **STATUTE: Repeal by Implication: Rule Fixed by Act Itself.** Where the later statute says in one section that "this act is not intended to repeal any law now in force, unless in direct conflict therewith, but is intended to be supplemental of such laws," there is no room for repeal by implication. In the face of this particular and specific rule established by the Act of 1887 itself, there can be no repeal under any general rule for the construction of statutes. Both must stand unless they are in direct conflict.

*Held,* by WOODSON, J., dissenting, that the said rule announced in the statute is of no controlling effect; but on the contrary shows the Legislature itself recognized that the act

was in necessary conflict with the Act of 1872, and therefore was meant to be understood as repealing that statute.

10. ———: ———: **Acts of 1872 and 1887: Discrimination in Freight Charges.** The Act of 1887 forbids a railroad company to receive "any greater compensation in the aggregate for the transportation of like kinds of property under similar circumstances and conditions for a shorter than a longer distance over the same line in the same direction"; while the Act of 1872 prohibits it to receive for the transporation of property any greater amount as compensation than is charged for the transportation of the same class of property over a greater distance upon the same road, without regard to directions or circumstances or conditions, and therefore, they are not in direct conflict. A shipper might found an action upon the violation of the Act of 1872, and a different action upon that of 1887, or he might found an action upon both, his right depending upon the different conditions; but different statutes do not conflict because they establish the same right or provide redress for the same wrong.

*Held*, by WOODSON, J., dissenting, that section 14 of article 12 of the Constitution commanded the Legislature to enact laws prohibiting unjust discriminations and extortions in freight and passenger rates, and section 12 meant no more than that; and the Legislature having enacted the Act of 1887, in obedience to section 14, that act should be held to be a complete substitute and repeal of the Act of 1872, since it covers the whole subject-matter, and fixes a different rule of action.

11. ———: ———: ———: **Penalties.** Nor does the fact that the penalties created by the two acts are different bring them into conflict. In order to enforce the penalties prescribed by the Act of 1887 for a violation of the short-haul clause, it is necessary to allege and prove that the shorter and longer hauls were made in the same directions and under similar conditions. But those allegations and proofs are not needed under the Act of 1872, and in a proceeding to enforce its penalties it would be no defense to establish the facts making defendant liable for the penalties prescribed by the Act of 1887.

*Held*, by WOODSON, J., dissenting, that a person cannot be guilty under one statute and innocent under another. The Act of 1872, which prohibits all discriminations in freight rates, just and unjust, under all conditions and circumstances, and punishes a violation thereof by a forfeiture of $1000 to the party aggrieved, cannot be reconciled with the Act of 1887, which does not prohibit all discriminations, but only unjust ones, and then only when the circumstances and conditions are the same and when the hauls are in the

same direction, and fixing a fine of $5000 to go to the school fund. The Act of 1872 is in necessary conflict with the Act of 1887, and was, therefore, repealed by it.

12. **CONSTITUTIONAL RIGHT: Self-Enforcing.** If a right be clearly created by the Constitution it can be enforced without legislative action. If the Constitut'on creates the right, the courts will find a remedy, and will not permit the Legislature to destroy the right by failure to act, or by affirmative action.

13. ———: ———: **Discrimination in Freight Rates: Recovery of Excess.** Section 12 of article 12 of the Constitution, declaring that "it shall not be lawful in this State for any railway company to charge for freight or passengers a greater amount, for the transportation of the same, for a less distance than the amount charged for any greater distance; and suitable laws shall be passed by the General Assembly to enforce this provision," is and was self-enforcing; and a shipper may recover the excess of charges in violation of said constitutional provision, from a railroad company which charged him higher rates per ton for the transportation of freight for certain distances over its road than it charged for the transportation of property of the same class a greater distance over its road, without the aid of the Act of 1872 or any other statute.

*Held*, by WOODSON, J., dissenting, that said section 12 cannot be held to be self-enforcing and give any possible effect to section 14 of article 12 and the Act of 1887 passed in pursuance to section 14, for section 14 commanded the Legislature to enact laws prohibiting unjust discriminations, and if section 12 is self-enforcing it, standing along, prohibits all discrimination in freight charges just and unjust, and therefore section 14 required the doing of a useless thing.

Appeal from Lafayette Circuit Court.—*Hon. Samuel Davis*, Judge.

AFFIRMED.

*Martin L. Clardy* and *Scott & Bowker* for appellant.

(1) No law enacted by the General Assembly shall relate to more than one subject, and that shall be clearly expressed in the title. Constitution 1875, sec. 28, art. 4; State v. Miller, 45 Mo. 495; People v. Denahy, 20 Mich. 349; State ex rel. v. County Court, 102

Mo. 531; State ex rel. v. Ranson, 73 Mo. 87; State ex
rel. v. Miller, 100 Mo. 445; Skinner v. Wilhelm, 30 N..
W. 313. (2) The Legislature can make the title of an
act as general as they see fit, so long as the act does not
contain separate, distinct and incongruous subjects;
when it does, it is void. Lewis v. Dunne, 134 Cal. 291;
State ex rel. v. Bronson, 115 Mo. 271; State ex inf. v.
Borders, 164 Mo. 221. (3) The amendment must be
germane, not only to the title of the act amended, but
also to the subject-matter of the law amended. State
v. Smith, 35 Minn. 257; Trumble v. Trumble, 55 N. W.
869; Comr's v. Mining & Smelting Co., 32 Pac. (Colo.)
717. (4) An amendatory act must be enacted with
the same formalities and strictness as original legisla-
tion. State ex rel. v. Tibbets, 71 N. W. 990. (5) If
the title and the bill both contain more than one sub-
ject the whole act is void. Cooley's Constitutional
Limitations (7 Ed.), 211. (6) The title of the act
must fairly indicate the contents of the bill, and must
not be misleading or deceptive. State v. Fulks, 105 S.
W. (Mo.) 733; Fish v. Stockdale, 69 N. W. (Mich.)
92; Adams v. Waterworks Co., 25 S. W. (Tex.) 605;
Harper v. State, 19 So. (Ala.) 857. (7) Statutes are
read and construed in the light of the common law.
Johnson v. Fluetsch, 176 Mo. 452; 6 Am. and Eng. Ency.
Law (2 Ed.), p. 270; Cooley's Constitutional Limita-
tions (7 Ed.), p. 94. (8) Common carriers were
allowed to make reasonable and just discriminations
at the common law. 4 Elliott on Railroads, secs. 1467,
1565 and 1676; 17 Am. and Eng. Ency. Law (2 Ed.), p.
135; 2 Hutchinson, Carriers (3 Ed.), secs. 521, 588 and
589; Railroad Commissioners v. Weld, 73 S. W. 529.
(9) Sections 1126 and 1160, R. S. 1899, were enacted
by the Legislature in 1872. Laws 1872, p. 69. (10)
Sections 1126 and 1160, enacted by the Legislature of
1872, are unconstitutional and void, as the act contain-
ing said sections was not passed in accordance with
section 32 of article 4 of the Constitution of 1865. State

ex rel. v. Lafayette Court, 41 Mo. 39; State v. Pre-
singer, 76 Mo. 346; State v. Coffee and Tea Co., 171
Mo. 634; City of Kansas v. Payne, 71 Mo. 159; State
ex rel. v. Baker, 129 Mo. 482; Witzmann v. Railroad,
131 Mo. 612; Shivley v. Langford, 174 Mo. 535; Dart
v. Bagley, 110 Mo. 42.   (11)   Where the act of the
Legislature is broader than its title, the act is void.
Cooley's Constitutional Limitations (7 Ed), pp. 202
and 211; In re Hauck, 38 N. W. 269; Callahan v.
Judges of Superior Court, 26 N. W. 806; Chicago &
Alton v. People, 67 Ill. 11; 26 Am. and Eng. Ency. Law
(2 Ed.), pp. 579 and 590.   (12)   The fact that the Act
of 1872 or sections 1126 and 1160 have been brought
forward in the various revisions, gives them no force
or validity, and said sections are void just as they
were when first passed by the Legislature of 1872.
Brannock v. Railroad, 200 Mo. 561.   (13)   A statute
revising the whole subject-matter of a former staute,
and evidently intended as a substitute for it, although
it contains no expressed words to that effect, repeals
the former.   Laws 1887 (Extra Session), p. 15; State
v. Roller, 77 Mo. 120; Yall v. Gillham, 187 Mo. 393;
Meriwether v. Love, 167 Mo. 514; Delaney v. Police
Court, 167 Mo. 667.   (14)   Discrimination by rail-
roads was first prohibited by the Constitution of 1875.
The Constitution of 1865 was silent upon this subject.
Constitution 1875, secs. 12, 14 and 23, art. 12. (15) Sec-
tions 1126 and 1160, supra, or the Act of 1872, page
69,   were   copied   verbatim   from   the   statute   of
Illinois.   Laws of Illinois 1871-2, p. 635.   (16)   A state
by adopting the statute of a sister state, adopts the
construction which has been given the statute by such
other state.   State ex rel. v. Macon County Court, 41
Mo. 453; Northcut v. Edgar, 132 Mo. 265; Burnside v.
Wand, 170 Mo. 531.   (17)   The Legislature of a state
has no power to conclusively and arbitrarily say that
all discriminations by railroads, regardless of condi-
tions and circumstances, are unlawful.   Sloan v. Rail-

road, 61 Mo. 24; Chicago & Alton v. People, 67 Ill. 11; 2 Hutchinson, Carriers (3 Ed.), sec. 588; Abbot v. Lendenbower, 42 Mo. 162. (18) Sections 1126 and 1160, or the Act of 1872, are unconstitutional and void, because they are in conflict with article 5 and section 1 of article 14 of the amendments to the Constitution of the United States. Cooley's Constitutional Limitations (7 Ed.), pp. 500-1-2-3-4-5-6-18 and 20; 2 Elliott on Railroads, sec. 686; 2 Hutchinson, Carriers (3 Ed.), sec. 574; Nebraska ex rel. v. Railroad, 31 L. R. A. 47; Ragan v. Trust Co., 154 U. S. 1014; Railroad v. Minnesota, 134 U. S. 970; Smyth v. Ames, 169 U. S. 819.

*Alexander Graves* for respondent.

(1) (a) McGrew v. Railroad, 177 Mo. 533 (approved in Cohn v. Railroad, 181 Mo.), correctly held that section 1126 and section 1134 should stand together and that the latter did not repeal the former by implication; especially as the 20th section of the Act of 1887 provided against a repeal by implication, declaring that it was supplemental to former laws, repealing only those in direct conflict. This construction is supported by overwhelming authority. State ex rel. v. County Court, 41 Mo. 459; 26 Am. and Eng. Ency. Law (2 Ed.), 733; Plum v. Lugar, 49 N. J. L. 557; 26 Am. and Eng. Ency. Law (2 Ed.), 732. (b) Before section 1134, which operates only on shipments in the same direction and under similar circumstances, can be construed to repeal section 1126 by implication, the court must find that it covers all the ground of section 1126; i. e., that it operates on shipments in opposite and other directions, regardless of circumstances and conditions. And even then it may be affirmative, cumulative or auxiliary. State ex rel. v. Walbridge, 119 Mo. 389; Hogan v. Guigon, 29 Grattan 709; Supervisors v. Iron Co., 93 U. S. 624; Radebaugh v. Shelly, 6 Ohio St. 316. "It is necessary to the implication of a repeal

that the objects of the two statutes are the same in the absence of a repealing clause. If they are not, both statutes will stand, though they may refer to the same subject." United States v. Claflin, 97 U. S. 552; People v. Platt, 67 Cal. 22; Rosborough v. Boardman, 67 Cal. 116; Rawson v. Rawson, 52 Ill. 62; United States v. Gear, 3 How. (U. S.) 120; Miller v. Edwards, 8 Colo. 528; Bowen v. Lease, 5 Hill (N. Y.) 225. The Act of 1887 copies four sections of the Interstate Commerce Act (Sewell v. Railroad, 119 Mo. 233). Read what the Illinois court said: Tyson v. Postlewait, 13 Ill. 728; Robinson v. Rippey, 111 Ind. 116; Blaine v. Bailey, 25 Ind. 165. (2) If appellant's theory of repeal be adopted, such construction would render the Act of 1887 (sec. 1134) unconstitutional. Article 12, sec. 12, of the Constitution has nothing in it about shipments "under similar circumstances and conditions in the same direction," and free or reduced rates, as has section 1134. The Constitution must be understood and construed in a plain, every-day, common sense manner, as it was by the common people who adopted it. Webb v. Lafayette Co., 67 Mo. 359; Law v. People, 87 Ill. 395; Manley v. State, 7 Md. 135. The variation of the Act of 1887 (sec. 1134), from article 12, section 12, of the Constitution is plain and obvious, if the act be construed as a repeal instead of being cumulative. Webb v. Lafayette County, 67 Mo. 359; State ex rel. v. Walker, 85 Mo. 41; Westport v. McGee, 128 Mo. 164; Devries v. McKoan, 6 N. Y. Legal Obs. 205, 1 Duer 640, 47 Barb. 118, 10 Abb. 350, 19 How. (N. Y.) 99. But the construction placed on these laws in McGrew v. Railroad, 177 Mo. supra, reconciles them; that is what courts seek to do. Cooley on Con-Lim. (5 Ed.), p. 220; Reid v. Smoulter, 128 Pa. St. 324; Lowery v. Rainwater, 3 Mo. App. 562. (3) (a) In the Revised Statutes of 1879 section 1 of the Act of 1872, after being incorporated and passed as a revised bill, was made sec. 820, R. S. 1879, and sec. 1126 R.

S. 1899; and its re-enactment, was in obedience to the mandate of the Constitution. Benton Co. v. Morgan, 163 Mo. 674; Railroad v. Brick Co., 85 Mo. 332. (b) The revision of 1879 is constitutional. State ex rel. v. Ranson, 73 Mo. 86, approved 128 Mo. 440. Cook v. Marshall County, 119 Ia. 396; Commonwealth v. Brown, 91 Va. 773; Yellow River Co. v. Arnold, 46 Wis. 222; State v. Bowers, 14 Ind. 196; Johnson v. Harrison, 47 Minn. 577; Railroad v. State, 104 Ga. 846; People v. Parvin, 74 Cal. 552; Cooley on Con. Lim. (6 Ed.), pp. 172, 175. (c) McGrew v. Mo. Pac., 177 Mo. 533, was correctly decided in all respects. However, if there is any semblance of reason to the contrary, section 1126 could only be affected in so far as it concerns shipments "under similar circumstances and conditions and in the same direction." And of the 39 counts in the petition that would render only one faulty, viz., count 17, amounting to $5.37. State v. Morrow, 26 Mo. 141; Purcell v. Ins. Co., 42 N. Y. Sup. Ct. 396; Scales v. State, 47 Ark. 476; McGruder v. State, 40 Ala. 349; Trustees v. Trenton, 30 N. J. Eq. 676; Davis v. Fairbanks, 3 How. (U. S.) 636. (4) Chicago & Alton v. People ex rel., 67 Ill. 11, is not even persuasive authority by reason of the difference in the constitutions of Missouri and Illinois. The Constitution of Missouri leaves no room for a judicial question and declares all discrimination to be unjust. Sec. 12, art. 12. This provision of the Constitution avoids all schedules not based on distance. The Act of 1872. now sec. 1126, R. S. 1899, is but the adequate expression of the Constitution. McGrew v. Railroad, 177 Mo. 544. (5) In the trial court, appellant confessed plaintiff's cause of action and pleaded by way of avoidance. But in this court appellant adopts a new theory by denying the continued existence or constitutionality of the act. We submit that the appellant's brief and argument in this court is a complete abandonment of the case tried and decided in the circuit court; that in

this court it adopts a different theory to that upon which appellant tried the case below; that the appellant for the first time invokes on this appeal constitutional provisions and repeal not claimed by it in the circuit court. Upon this proposition we challenge the closest scrutiny of the pleadings, the declarations of law asked by appellant, and the evidence offered by appellant and the motion for new trial as shown by its own abstract. It will be seen by examination of the record that the pleadings of defendant in the circuit court were plain confession and avoidance, there being no denial as required by the statute. Delzel v. Surety Co., 176 Mo. 279; R. S. 1899, sec. 864. (6) Appellant cannot abandon the theory upon which it tried the case in the circuit court, as disclosed by its pleadings, its evidence offered and its declarations of law asked, and motion for new trial, and spring a new theory in this court; but the statute governing "Practice in the Supreme Court and Courts of Appeal" is inexorable, and rigidly binds appellant to the theory upon which it tried the case in the circuit court. R. S. 1899, sec. 864; St. Joseph v. Ins. Co., 183 Mo. 7; State ex rel. v. Chick, 146 Mo. 661; Walker v. Owen, 79 Mo. 568; Evans v. Kunze, 128 Mo. 680; Bray v. Seligman, 75 Mo. 40; Hogan v. Brady, 155 Mo. 668; Long v. Long, 141 Mo. 367; Mirrieles v. Railroad, 163 Mo. 486; Fisher v. Realty Co., 159 Mo. 568; Hill v. Drug Co., 140 Mo. 439; Dice v. Hamilton, 178 Mo. 90; Whetson v. Shaw, 70 Mo. 580; Hubbard v. Fuchs, 164 Mo. 430. And the Supreme Court of the United States by uniform decisions established the rule prohibiting departure from the theory of the trial below by which is wholly prevented the springing a new theory on appeal, even without a statute on the subject. Ewing v. Howard, 7 Wall 499; Barrow v. Reab, 9 How. 366; Ins. Co. v. Mordecai, 22 How. 66; DeSobry v. Nicholson, 3 Wall. 420; Clements v. Nicholson, 6 Wall. 299; Tome v. Dubois, 6 Wall. 548; The Georgia v. U. S., 7

Wall. 32; Alviso v. U. S., 8 Wall. 337; Wheeler v. Sedgwick, 94 U. S. 1; Wilson v. McNamee, 102 U. S. 572; Springer v. U. S., 102 U. S. 586; Upton v. McLaughlin, 105 U. S. 640; Upton v. Kent, 105 U. S. 646. Appellant cannot on appeal for the first time in the history of the case raise a constitutional question. The specific constitutional right must have been claimed and denied in the trial court. St. Joseph v. Ins. Co., 183 Mo. 1; Parlin v. Hord, 145 Mo. 118; Browning v. Powers, 142 Mo. 332; James v. Mut. Reserve, 148 Mo. 18; Vaughan v. Railroad, 145 Mo. 57; Bennett v. Railroad, 105 Mo. 642; Baldwin v. Fries, 103 Mo. 286; Keller v. Ins. Co., 95 Mo. App. 639; Miller v. Texas, 153 U. S. 535; Morrison v. Watson, 154 U. S. 111; Powell v. Supervisors, 150 U. S. 433; Sayward v. Denny, 158 U. S. 183; Ex parte Spies, 123 U. S. 81. Constitutional objection to the title of the Act of 1872, sec. 820, R. S. 1879, sec. 1126, R. S. 1899, cannot be raised for the first time on appeal. Parlin v. Hord, 145 Mo. 57. Nor can objection that the passage of the law fails to conform to the constitutional method be made for the first time on appeal. Browning v. Powers, 142 Mo. 332; Bank v. Kurkouski, 45 Neb. 1; Auditor v. Haycrafe, 77 Ky. 284; Anderson v. Grand Valley, 85 Pac. 313.

WILLARD P. HALL, Special Judge—Differences in opinion in Division resulted in the filing of two opinions therein, and in the transfer of the case to Banc. One member of the court having been of counsel in the trial court, only six of the judges sat in the case in Banc, and they dividing equally, a special judge was called in.

This is an action by plaintiff to recover damages from defendant for its violation of the short-haul rule in charging him greater amounts, i. e., higher rates per ton, for transportation of freight for certain distances over its railroad than it charged for transportation

of freight of the same class for greater distances over said railroad.

Plaintiff owned and operated a coal mine at Myrick, Missouri, on the line of said railroad, and shipped his coal from there to various stations on said railroad in this state. The petition contained thirty-nine counts, covering a great amount of transportation from Myrick to different stations. In each count were stated the quantity in tons of coal transported, the station of destination, its distance from Myrick, the rate per ton charged, the lower rate charged for coal of the same class from Myrick to another station at a greater distance from Myrick on defendant's railroad in Missouri, and the total excess of the charges illegally made for all the coal transported.

In its answer to each count defendant admitted the allegations of fact in the petition as above stated, but it denied that the rate charged plaintiff was illegal for reasons stated. Those reasons were that the rate charged plaintiff had been fixed by the Board of Railroad and Warehouse Commissioners, that the rate from Myrick to the more distant station had also been fixed by said board and had been made by defendant because of the fact that said station was a competitive point, which rendered the conditions and circumstances of the latter station dissimilar from those of the station to which plaintiff had shipped his coal, and prevented the difference between the two rates constituting discrimination.

The case was tried by the court without a jury.

Plaintiff submitted his case upon the pleadings.

Defendant asked the court to give a declaration of law to the effect that plaintiff was not entitled to a judgment upon the pleadings, and the court refused it.

Defendant offered printed and unauthenticated copies of the reports of the Board of Railroad and Warehouse Commissioners in support of its answer.

The trial court rejected same, because of the lack of authentication.

Defendant offered to prove by its general freight agent the reason for the differences in rates complained of by the plaintiff, but the court refused to receive the evidence.

At the close of the evidence, the court gave a declaration of law for plaintiff to the effect that upon the pleadings and evidence the finding and judgment should be for plaintiff.

In accordance with said declaration of law the court rendered judgment for plaintiff on the various counts of the petition for the amount of the excessive charges respectively stated therein, but not for the statutory penalties sued for. The judgment was solely for said excessive charges, and aggregated $7,462.43.

On this appeal by defendant from that judgment, defendant does not urge as error the action of the trial court in rejecting the evidence offered as hereinbefore stated, but assuming that plaintiff's action is entirely founded upon sections 1126 and 1160, Revised Statutes 1899, it seeks to reverse said judgment on the ground that said sections of the statute are invalid, because unconstitutional for various reasons assigned, and because repealed by a subsequent statute.

It is unnecessary at this place to further explain the nature of the objections urged against the validity of said sections; that will be done in the opinion.

Plaintiff's counsel says that said objections were not made in the trial court, and contends that they cannot be made in this court for the first time.

No further statement is deemed necessary at this time.

I. It is, of course, true, as contended by plaintiff's counsel, that an appellant cannot try a case on one theory in the trial court and upon another theory in the appellate court, and that, generally speaking,

if a constitutional question is not raised at the trial, it cannot be urged upon appeal.

But where plaintiff's cause of action is founded upon a statute, the constitutionality and life of the statute are involved from the start to the finish, because unless the statute has legal force and effect plaintiff has no cause of action, and defendant, at any time and in any court until the final end of the case, has the right to object that plaintiff's petition does not state facts sufficient to constitute a cause of action for the reason that the statute upon which it is founded is unconstitutional or has been repealed. Defendant has the right to object for the first time in the appellate court that the petition does not state a cause of action, and it matters not what the ground of objection may be, provided only that it be good and sufficient in law. [R. S. 1899, sec. 602; Andrews v. Lynch, 27 Mo. 167; Burns v. Patrick, 27 Mo. 434; Syme v. Steamboat, 28 Mo. 335; Weil v. Greene County, 69 Mo. 281; Wells v. Mutual Benefit, 126 Mo. 630; State ex rel. v. Smith, 141 Mo. 1; State ex rel. v. Smith, 177 Mo. 69, 92; Kaukauna Co. v. Green Bay Co., 142 U. S. 254.]

II.   The first objection made to the validity of said sections of the statutes is that the act containing them was not passed in accordance with the provision of the Constitution then in force in relation to the title of laws enacted by the Legislature.

Said sections of the Revised Statutes of 1899 were sections 1 and 4 of an act of the Legislature approved April 1, 1872, Laws 1871, p. 69. Section 1126 was section 1 of said act; section 1160 was section 4.

At the time said act was passed the Constitution of 1865 was in force. Section 32, article 4, of said Constitution provided: "No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title."

The title of said act was: "An act to prevent

*unjust* discrimination and extortion in the rates to be charged, by the different railroads in this State, for the transportation of freight on said roads.''

Section 1 of said act (now sec. 1126, R. S. 1899), prohibited every railroad company in the State from doing three things: 1. From charging for the transportation of property for any distance over its road any larger amount as compensation, than is charged by it for the transportation of similar quantities of the same class of property over a *greater* distance over its road. 2. From charging different rates for receiving, handling or delivering freight at different points on its road, or any road used by it in connection therewith. 3. From charging for the transportation of property over any portion of its road a greater amount as compensation, than shall be charged by it for the transportation of similar quantities of the same class of property over any other portion of its road of *equal* distance.

Section 4 of said act (now sec. 1160, R. S. 1899), merely prescribed a penalty for violating the provisions of the act, and need not be considered further in this connection.

The objection is that the body of the act, *i. e.*, section 1 thereof, was broader than the title.

In support of that objection counsel argue that the title was aimed at unjust discrimination only, whereas the body of the act prohibited every discrimination, just, as well as unjust. They say that the title conceded that there might be just discrimination, but that the body of the act denied such concession. They say that the title was merely declaratory of the common law, which prohibits only unjust discrimination and tolerates just discrimination, while the body of the act prohibited every discrimination without regard to whether it was just or unjust.

I do not think any of these arguments sound. The body of the act did not prohibit all discrimina-

tions; it prohibited only the _three discriminations specified therein. It did not prohibit any just discrimination at all; the legislative prohibition was a legislative condemnation of the specified discriminations as unjust and they became unjust by reason of such condemnation. Grant that the title conceded that there might be just discrimination, how did that concession imply that the body of the act would not condemn given discriminations as unjust, and prohibit them under pains and penalties? The common law rule as to discriminations by common carriers is not entirely settled. The courts are not all agreed as to what that rule is. [Interstate Com. Commission v. Railroad, 145 U. S. 263, 275.] But it is conceded that at common law only unjust discriminations are condemned, and that the question as to whether a discrimination is unjust is for the courts to decide. At common law there is no list of specific discriminations condemned as unjust. Every case is to be decided by the court on its own facts.

Counsel's argument, therefore, that the title was declaratory of the common law, is that the title indicated that the act would not declare or define anything to be an unjust discrimination and prohibit it, but that the act would merely "prevent" such things as the courts might decide to be unjust discriminations. If such a thing was capable of accomplishment legally, I do not think that the title can be so construed. The title clearly indicated that the act would prohibit such things as might be declared therein to be unjust discriminations.

If this last argument of counsel's about the title being merely declaratory of the common law be correct, then, under said title, the act legally could probably have contained no provision whatever against discriminations between localities in the State, but its provisions legally would probably have been restrict-

ed to discriminations between individuals, for the reason that the common law probably does not require equality between localities. [Beale & Wyman on Railroad Rate Regulation, sec. 831.] These authors say in part, speaking of the common law: "While discrimination in rates between individuals is illegal, even if the higher rate is reasonable in itself, this is not true as to discrimination between localities. If a general rate charged to all shippers in a certain place is reasonable in itself it is not rendered illegal merely because shippers in another place are charged a lower rate."

A contrary view seems to be expresed in C. & A. Railroad v. People, 67 Ill. 11, but the view of said authors appears to be sustained by Interstate Com. Com'n v. B. & O. Railroad, 145 U. S. 263, 275, supra, where it is said in part that prior to the enactment of the Interstate Commerce Act the principles of the common law demanded little more than that common carriers "should carry . . . in the order in which the goods were delivered at the particular station, and that their charges for transportation should be reasonable," and that "it was even doubtful whether they were bound to make the same charges to all *persons* for the same service; though the weight of authority in this country was in favor of equality of charge to all *persons* for similar services."

If, therefore, the contention of defendant's counsel in this respect is correct, and if the common law forbids only unjust discrimination between individuals, and not between localities at all, then logically it would follow, as stated above, that the word "discrimination" in the title of said act referred only to discrimination between individuals, and that the act legally could not have prohibited any discrimination between localities.

Indeed this view was suggested in one of the opinions in Division. It was suggested in said opinion

that the things prohibited by the act are not discriminations at all. This view is not sound.

. The entire subject of discrimination by railroads is one of very recent growth. This is true of discrimination between individuals as well as of discrimination between localities. On account of the uncertainties and the insufficiencies of the common law upon the subject, many of the states have adopted and enacted laws, constitutional and statutory, prohibiting and regulating discriminations, both local and individual. It is said that in more than twenty-eight states local discrimination is now forbidden. [Beale & Wyman on Railroad Rate Regulation, sec. 1211.] It is entirely clear that courts, law-writers, legislatures and constitutional conventions speak of discrimination between localities in the same sense that they do of discrimination between persons. And I am entirely clear that the word "discrimination" in said title applied to local as well as individual discrimination, and included what is known as a short-haul regulation.

The title was not declaratory of the common law.

It is, of course, not disputed that, under such a constitutional provision as that of the Constitution of 1865, the body of an act must not be broader than its title. As said by Judge Cooley, the title is the conclusive index to the legislative intent. And acordingly it has been held by this court that, under a title, "An Act to change the penalty for disturbances of the peace," the Legislature could not make that a disturbance of the peace which was not previously such an offense. This case has been urged quite vigorously by defendant's counsel in support of their contention. But there was nothing in the title of the Act of 1872 to indicate a purpose to merely provide penalties for discriminations. The words of the title, "An Act to *prevent* unjust discriminations," etc., cannot be restricted to the mere imposition of penalties, but

clearly extend to the prohibition of things as well as to the imposition of penalties for doing the things. And there is nothing in said words restricting the body of the act to existing unjust discriminations.

The title was broad enough to include every unjust discrimination, whether unjust in law prior to the enactment or not, and broad enough to authorize the Legislature to declare unjust discriminations which previously had been tolerated under the law. The provisions of the act made the things prohibited unjust discriminations, and thus said provisions were fully covered by the title.

This must be true unless the words of the title be held to have intended to make the question as to whether a discrimination is unjust a judicial question, and to restrain the Legislature in said act from declaring any discrimination unjust. This is but another way of stating counsel's contention hereinbefore already stated. There is nothing in the words of the title from which such intention can be inferred.

In my opinion the body of the act in no sense can be said to be broader than its title. The *title* indeed is broader than the body of the act. The title applies to and includes every unjust discrimination, while the body of the act covers only three specified acts of unjust discrimination.

Said act, title and all, was substantially a copy of a statute of Illinois enacted in 1871. The only difference between the two was in the penalties imposed. The Illinois statute provided for a forfeiture of the franchises of the guilty railroad company, while our act did not. This difference is immaterial here.

The Supreme Court of Illinois in 1873, *after* our Act of 1872 had been enacted, decided that the Illinois statute was unconstitutional (C. & A. Railroad v. People, 67 Ill. 11), and that decision is urged as strong and persuasive, though not controlling authority, in

support of the objection now under consideration. But in that case it was not decided that the Illinois statute was unconstitutional on acount of any defect in its title. The invalidity was placed upon entirely different and broader grounds. The Constitution of Illinois contained a provision which the court construed to restrict the power of the Legislature to prohibit discriminations to those which are unjust, and to make the question of the injustice of any alleged unjust discrimination a judicial question to be decided by the courts. The court held that under that constitutional provision the Legislature had no power to *declare* anything to be an unjust discrimination, that the Illinois statute did declare the prohibited things to be unjust discrimination, and, therefore, that said statute was in conflict with the Constitution, and void. In discussion the court said that the Legislature had power to prohibit only unjust discriminations, and that said act prohibited both just and unjust discriminations, but the gist of the decision was as just stated, to-wit, that the constitutional provision made the question of the injustice of every discrimination a judicial question, to be decided by the courts and not by legislative enactment. Nothing was said by the court about the title of said statute, except that in the course of argument the court remarked that said title indicated the purpose of the Legislature to follow the Constitution and to prohibit unjust discriminations only, but that the statute had gone further. The point was not made in that case, nor did the court intimate that the title was defective because not broad enough to cover the provisions of the statute, upon the assumption that the Legislature of Illinois had the power to declare the things mentioned therein to be unjust discriminations. The inference is quite strong that all parties concerned thought the question involved in said case to be one of power on the

part of the Illinois Legislature, and not of form or mode of executing said power.

There is nothing in that case, in my opinion, opposed to the conclusion hereinbefore stated, that the title, "An Act to prevent unjust discrimination," etc., is broad enough to include all things which the Legislature may legally prohibit as unjust discrimination.

At the time of the passage of our Act of 1872, the Constitution then in force contained no provision limiting the power of the Legislature to prohibit discrimination by railroads.

III. Defendant's counsel next object that if the Act of 1872 was not unconstitutional as passed, it subsequently became unconstitutional upon the adoption of our present Constitution in 1875, for the reason that the provisions of said act are in conflict with certain provisions of said Constitution.

If said act is in conflict with said Constitution, it became inoperative upon the adoption of the Constitution. Section 1 of the schedule which forms a part of that Constitution so provides.

The constitutional provisions referred to as the basis of said objection constitute section 14 of article 12 of our present Constitution, and read as follows:

"Railways heretofore constructed, or that may hereafter be constructed in this State, are hereby declared public highways, and railroad companies common carriers. The General Assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and shall from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on said railroads, and enforce all such laws by adequate penalties."

Those provisions were borrowed literally from the Illinois Constitution of 1870, and it was those pro-

visions that the Supreme Court of that state, in 1873, in C. & A. Railroad v. People, 67 Ill. 11, construed to limit and restrict the power of the Legislature to prohibit discriminations by railroads and other common carriers to those discriminations which are unjust, and to make the question of the injustice of any alleged unjust discrimination a judicial question to be decided by the courts.

It is urged that we adopted the provisions with the construction that had been placed upon them. The general rule is that where one state borrows a constitutional provision from another state that had previously been construed by the courts of the latter state, such construction is presumed to have been adopted along with the provision. The reason for said rule is that if it were intended to exclude the previous construction, the legal presumption is that the terms of the provision would be so changed as to effect that intention. [Com. v. Hartnett, 3 Gray (Mass.) 450; Pennock v. Dialogue, 2 Pet. (U. S.) 1; Hogg v. Emerson, 6 How. (U. S.) 483.] And if we had adopted those provisions of the Illinois Constitution alone without more, there would have been great force in the contention that the effect of it was to repeal the Act of 1872, although it is apparent that the question even then would have been quite different from that which would have been presented had we first adopted said constitutional provisions, and afterwards enacted the Act of 1872. In the latter contingency, the presumption would have been very great that by adopting said constitutional provisions it was our intention to prevent the enactment of such an act as the Act of 1872, and to prevent the Legislature from defining unjust discrimination, and to permit it to prevent only such discrimination as the courts might decide to be unjust. But the Act of 1872 was enacted before our adoption of said constitutional provisions and said act was within the power of our Legislature at the time of its enact-

ment, and it declared specific acts of discrimination to be unjust and unlawful; and had said constitutional provisions, standing alone, been adopted by us, the question then would have been as to the effect of the use of the word "unjust" in said provisions to set aside the policy of this State as declared in said act, and to repeal it because declaring specific acts of discrimination unjust without regard to the decisions of the courts thereon. It is clear that the two questions suggested here are not identical, and that they would not necessarily require the same answer. In the one case the presumption would be much greater than in the other.

But we did not adopt those constitutional provisions alone. Not only did we adopt as a part of our present Constitution said provisions which annulled the Illinois statute, that had enacted the short-haul rule, but we also adopted the very gist of that statute, i. e., the short-haul rule itself, and wrote that very rule into our Constitution, making it section 12 of article 12 thereof. Said section reads as follows:

"It shall not be lawful in this State for any railway company to charge for freight or passengers a greater amount, for the transportation of the same, for a less distance than the amount charged for any greater distance; and suitable laws shall be passed by the General Assembly to enforce this provision; but excursion and commutation tickets may be issued at special rates."

That action was most significant. The Illinois court had decided in 1873 that the Illinois statute prohibited all discrimination by railroad companies in the transportation of *freight* in any direction, the same or not; under any circumstances or conditions, similar or dissimilar; and whether just or unjust in the opinion of the courts. The convention that framed our Constitution of 1875, with that decision before it, took the gist of that statute and inserted it into our

Constitution, establishing the short-haul rule, but extending it to the transportation of passengers as well as that of freight. That action is consistent only with the intent on the part of the convention that framed the Constitution, to establish the short-haul rule in this State as a part of its fundamental law.

Moreover, in 1873, Pennsylvania had adopted a new Constitution, a section of which prohibited *undue* or *unreasonable* discrimination in charges or facilities for the transportation of passengers or freight, and provided that "persons and property transported over any railroad shall be delivered at any station at charges not exceeding the charges for transportation of persons and property of the same class, *in the same direction*, to any more distant station." [Art. 17, sec. 3.] Two years afterwards when we framed our present Constitution, with the recent constitutions of both Illinois and Pennsylvania before us, we took the short-haul rule, but we worded it in our own way, following in a general way the Illinois statute, ignoring the limitations in the Pennsylvania Constitution restricting the rule to hauls in the same direction, and making it apply to hauls in the same or the opposite direction.

Since 1875 other states have adopted constitutions making a short-haul provision a part of them. Said states are Arkansas, California, Kentucky, Montana, Oklahoma, South Carolina, Virginia and Washington. In none of them is the short-haul rule stated so broadly or unconditionally as in our Constitution. In most of them the haul must be in the same direction, in some of them under the same or like conditions and circumstances, and in not a few of them some state commission is authorized to grant relief from the rule on a proper showing.

The language of our Constitution, so widely different from all the others in these respects, was not a mere accident, but indicates a- fixed and settled purpose and intention to establish a rigorous and unalter-

able and unvarying short-haul rule as the policy of
the State.

*The effect of making the short-haul rule a part of
our Constitution was to exclude the construction by
the Illinois Supreme Court of the Illinois constitu-
tional provision borrowed by us.*

The two sections of our Constitution should be
read together in determining their meaning, their pur-
pose and their effect. We should also consider the
condition of the law at the time we adopted said Con-
stitution. At that time the Constitution of 1865 was
in force. That Constitution, as hereinbefore said, con-
tained no restriction upon the power of the Legisla-
ture over discrimination in railroad rates, and, under
that Constitution, said power was unlimited unless re-
stricted in some manner by the Constitution of the
United States. "The governments of the states pos-
sess all the powers of the Parliament of England, ex-
cept such as have been delegated to the United States or
reserved by the people. The reservations by the people
are shown in the prohibitions of the constitutions" of
the states. The state constitutions are not grants of
power, but are restrictions on the powers which the
state government would otherwise possess. [Munn v. Il-
linois, 94 U. S. 113; State v. Tower, 185 Mo. 79; Ex
parte Roberts, 166 Mo. 207, 212; State ex rel. v. Shep-
pard, 192 Mo. 497, 506; Ex parte Berger, 193 Mo. 16.]
The legislature of a state possesses all legislative power
except as restricted by the provisions of the Constitu-
tion of the United States or of the Constitution of the
state. This fundamental rule of our state govern-
ments is declared by section 1 of article 4 of our pres-
ent Constitution in the provision: "The legislative
power, subject to the limitations herein contained,
shall be vested in a Senate and House of Representa-
tives to be styled 'The General Assembly of the State
of Missouri.' "

In State v. Tower, 185 Mo. 79, this rule is stated,

and it is said that under said rule "the Legislature has the power to declare places or practices . . . public nuisances, although not such at common law," that is, to "declare that a nuisance which before was not a nuisance."

The regulation of railroads is within the legislative power of the state. [Beale & Wyman on Railroad Rate Regulation, secs. 1301-1306; Munn v. Illinois, supra; C., B. & Q. Railroad v. Iowa, 94 U. S. 155; Peik v. Railroad, 94 U. S. 164.] It was in the exercise of that power that the Legislature passed the Act of 1872.

Sections 12 and 14 of said article of our Constitution when read together, as they should be, leave no doubt of the intention of its framers to adopt the short-haul rule, and to put it in operation in this State. Such intention, as hereinbefore stated, is clearly manifested in section 12, and there is nothing in section 14 indicating a contrary intention. The language of the latter section that is supposed to indicate a contrary intention is that which directs the Legislature to pass laws "to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs in this State." It is argued that an implied rstriction arises from that language limiting the power of the Legislature to prevent only such discrimination as is unjust, that it could not have been intended to thus restrict the power of the Legislature in section 14, and in section 12 to have empowered the Legislature to enforce the short-haul rule not only where it is just to do so, but also where it is unjust to do so, and, therefore, that said implied restriction should be extended to section 12 and applied to it as well as to section 14.

The implied restriction upon the power of the Legislature thus sought to be enforced, arises from language in section 14 which refers to discrimination generally, whereas the short-haul rule established by

section 12 applies to a particular class of discrimination, and is specifically established in positive and explicit terms. If there is any inconsistency between the two sections in the respect under consideration, the specific class of discrimination treated of in section 12 must be regarded as withdrawn from the provisions of section 14 relating to discrimination generally, and the positive and explicit terms of the former section cannot be restrained by such implication arising from the subsequent general words of the latter section.

The following statement of the established rule as to the controlling effect of a particular enactment over a general enactment, in the construction of statutes, fits this case: "It is an old and familiar rule that where there is in the same statute a particular enactment and also a general one, which in its most comprehensive sense would include what is embraced in the former, the particular enactment must be operative and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment." [26 Ency. Law (2 Ed.), 629.] Generally "if two provisions are irreconcilably repugnant, the last in order of time and local position will be preferred," but this general rule gives way where the first provision is particular and the last one is general. In such case an exception is made, and the particular intent prevails. [8 Cyc. 743.] In speaking of the effect that positive and explicit provisions have to deny an implication from subsequent words, Mr. Chief Justice MARSHALL said in Faw v. Marsteller, 2 Cranch (U. S.) 10: "In searching for the literal construction of an act it would seem to be generally true that positive and explicit provisions, comprehending in terms a whole class of cases, are not to be restrained by applying to those cases an implication drawn from subsequent words unless that implication be very clear, necessary and irresistible."

If there is any implied restriction upon the power of the Legislature over discrimination in railroad rates, arising from the general provisions of section 14, the short-haul rule, established specifically by the positive and explicit provisions of section 12 must be excepted from said implied restriction.

But no such implied restriction arises from the provisions of section 14.

The construction of the language of said provisions by the Illinois court was rejected by us, and rejected *in toto,* and those provisions should be construed in the light of the general rules that govern in the construction of constitutional provisions.

Constitutional limitations upon the legislative power may be made, it is true, either expressly or by implication, but the implication must at least be clear and strong and convincing (Danville v. Pace, 25 Gratt. 9; Whitlock v. Hawkins, 105 Va. 242, 248), if not absolutely necessary (Cooley's Const. Lim. [6 Ed.] 201, 204).

If section 14 of article 12 be construed in the light of that rule, and of the fundamental rule that the provisions of a State Constitution are not grants of power, but limitations of power, there can be no serious doubt about its meaning.

That portion of said section that relates to the subject of discrimination reads as follows: "The General Assembly shall pass laws to . . . prevent unjust discriminations . . . in the rates of freight and passenger tariffs on the different railroads in this State."

Those words are a mandate to the Legislature to prevent unjust discriminations in railroad rates, and are not a limitation upon its power to prevent such discriminations as it may deem proper to prohibit. A constitutional command to the Legislature to do one thing is not a denial of its power to do other things.

In Evers v. Hudson, 36 Mont. 135, it was held

that a constitutional provision requiring the Legislature to establish free common schools is a mandate to the Legislature to establish such schools, and is not a limitation upon the power of the Legislature to establish other schools. The court said that the provision "is not a limitation upon the legislative power, but is a solemn mandate to the Legislature."

In State v. Fountain, 69 Atl. 926 (Del. Gen'l Sess. 908), it is held that a constitutional requirement that certain questions shall be submitted by the Legislature to a vote of the people, is not a limitation upon the power of the Legislature to submit other questions to a vote of the people.

To the same effect is the separate concurring opinion of Justice WILLARD in Barto v. Himrod, 8 N. Y. (4 Seld.) 483, 493, in which he said: "And I do not mean to lay much stress upon the implication arising from the *express* provision to submit a law creating a debt to the people, and the *silence* of the Constitution in relation to submitting to the people other matters of legislation. The maxim, *expressio unius est exclusio alterius,* is more applicable to deeds and contracts than to a constitution, and requires great caution in its application in all cases."

The Constitution of Pennsylvania provided: "The Legislature shall, as soon as conveniently may be, provide by law for the establishment of schools throughout the State, *in such manner that the poor may be taught gratis.*" An act of the Legislature establishing a school system was attacked on the ground that it violated that provision of the Constitution. In answer to the objection raised, Chief Justice BLACK, who wrote the opinion of the court, pointed out the fundamental difference between the Constitution of the United States and the constitutions of the states, *i. e.,* that the former is a grant of powers, while the latter are limitations of power, and, after quoting the above section of the State Constitution, added: "It seems to

be believed that the last clause of this section is a
limitation to the power of the Legislature, and that no
law can be constitutional which looks to any other ob-
ject than that of teaching the poor gratis. The error
consists in supposing this to define the *maximum* of the
legislatve power, while in truth it only fixes the *mini-
mum*. *It enjoins them to do thus much, but does not
forbid them to go beyond it."*

In Williams v. Mayor of Detroit, 2 Mich. 560, 563-
564, the court held that though the maxims *expressio
unius est exclusio alterius* and *expressum facit cessare
tacitum* generally apply to the construction of all in-
struments and laws, there are certain laws to which
the maxims cannot be *strictly* applied without doing
violence to the plain intent of the framers of the laws,
and that this is especially true in the construction of
*state* constitutions, owing to their character and ob-
jects, which the court explained at some length, and
then, in effect, said that the imposition by the Con-
stitution upon the Legislature of certain specific du-
ties, limitations, restraints and regulations in certain
important particulars, binds the Legislature, of course,
in those particulars, but that notwithstanding that,
*all other acts properly pertaining to the legislative
power of the state are within the competency of the
legislative department, and binding upon the people.*

The maxims mentioned in the case last cited have
been, by all who make it, counsel and members of this
court, invoked as the chief support for the contention
that said portion of section 14 limits the power of the
Legislature. But those maxims are not rigid rules
of unvarying and universal application; they are mere-
ly rules adopted for the construction of written words,
and like all such rules, are intended to be used for the
purpose of ascertaining the true meaning of the words,
in order that the purpose intended may be accom-
plished, and should never be permitted to be used to ob-
scure that meaning or thwart that purpose. [Lexing-

ton v. Commercial Bank, 130 Mo. App. 687, 692; Mc-
Farland v. Railroad, 94 Mo. App. 336, 342; Brown v.
Buzan, 24 Ind. 194, 198; Scott v. Laporte, 162 Ind.
34, 54; Multnomah County v. Guarantee Co., 46 Ore. 523
537; State v. Houghton, 142 Ala. 90, 97; Wheeling
Railroad v. Railroad, 72 Ohio St. 368, 385; Swick v.
Coleman, 218 Ill. 33, 40; Helm v. Grayville, 224 Ill.
274, 278-279; Portland v. Tel. Co., 103 Me. 240, 249;
Campbell v. Skinner Mfg. Co., 53 Fla. 632, 640; End-
lich on Interp. Stat., secs. 398-399, 533 and 535; 1
Story on the Const. (4 Ed.), sec. 448; Potter's Dwar-
ris on Stats. and Consts., p. 48; 26 Ency. Law (2 Ed.),
604; Jameson, Const. Conv. (4 Ed.), sec. 574; Brown's
Legal Maxims (7 Am. Ed.), p. 653; Saunders v. Evans,
8 H. L. Cas. 729; Eastern Archipelago Co. v. The
Queen, 2 El. & Bl. 878, 879; Hon. Joel Parker, Deb.
Mass. Conv., 1853, vol. 1, p. 153.]

In 1 Story on the Constitution (4 Ed.), sec. 448,
in speaking of said maxims, Judge Story says: "These
maxims, rightly understood and rightly applied, un-
doubtedly furnish safe guides to assist us in the task
of exposition. But they are susceptible of being ap-
plied, and indeed are often ingeniously applied, to
the subversion of the text and the objects of the in-
strument. Thus it has been suggested that an affirm-
ative provision in a particular case excludes the exist-
ence of the like provision in every other case, and a
negative provision in a particular case admits the ex-
istence of the same thing in every other case. Both
of these deductions are, or rather may be, *unfounded
in solid reasoning.* Thus it was objected to the Con-
stitution that, having provided for the trial by jury in
criminal cases, there was an implied exclusion of it in
civil cases. *As if there was not an essential difference
between silence and abolition, between a positive adop-
tion of it in one class of cases and a discretionary
right (it being clearly within the reach of the judicial
powers confided to the Union) to adopt or reject it in*

*all or any other cases.* One might with just as much propriety hold that because Congress has power 'to declare war,' but no power is expressly given to make peace, the latter is excluded; or that, because it is declared that 'no bill of attainder or *ex post facto* law shall be passed' by Congress, therefore Congress possesses in all other cases the right to pass any laws. *The truth is that, in order to ascertain how far an affirmative or negative provision excludes or implies others, we must look to the nature of the provision, the subject-matter, the objects and the scope of the instrument. These, and these only, can properly determine the rule of construction."*

Lord Chancellor CAMPBELL said in Saunders v. Evans, supra, that said maxims are not of universal application, but depend upon the intention of the parties as discoverable upon the face of the instrument or of the transaction.

Judge Parker said in the Constitutional Convention of Massachusetts of 1853, supra: "I do not understand the principle to be that the mention of one mode excludes all other modes *which would have existed but for the mention of that mode.*"

These authorities fully sustain my construction of the portion of said section 14 of the Constitution quoted above. That portion of said section was not intended as a grant of power to the Legislature to prevent discrimination in railroad rates, the Legislature already possessed that power; but the Legislature, with the single exception of the Act of 1872, had never exercised it, and that part of said section was adopted as a command to the Legislature to further exercise it, and to enact laws to prevent all unjust discriminations in such rates. The use of the word "unjust" was not made to limit the power of the Legislature in that regard, *but to require the exercise of said power.* It was not intended by said word to de-

230 Sup—34

prive the Legislature of the power of determining by statute what should be unjust discrimination, and to make that a judicial question for the decision of the courts, which otherwise the Legislature could have finally settled, *but it was intended to require the Legislature to act, and to declare what should be unjust discrimination.* The action of the Legislature was still to be final and conclusive, just as it would have been before, and discrimination which the Legislature should prohibit, in the meaning of that section of the Constitution, would be unjust and illegal.

On the other hand, if the Legislature should enact that any given discrimination might be practiced by the railroads *except that prohibited by section 12 of said article,* such discrimination would be legal, and the courts could not declare it unlawful on the ground that it was unjust, and therefore prohibited by the provisions of said section 14.

It is suggested that the clause of said section 14 that requires the Legislature to pass laws establishing reasonable maximum rates for railroads is against the above conclusion, for the reason that said clause clearly was intended not only to require such legislation, but also to limit the power of the Legislature in that regard to fixing rates that are reasonable, and to prohibit it from fixing rates that are *below* what are reasonable; and that if such limitation and prohibition were intended in relation to rates, like limitation and prohibition were intended as to discrimination, and that the Legislature cannot prevent just discrimination any more than it can prevent reasonable rates.

I do not think that section 14 can be construed to limit or restrict the power of the Legislature in regard to rates. That section clearly was intended to require the Legislature to fix such maximum rates for railroads as it might deem reasonable, and there was no intimation contained in said section that the rea-

sonableness of the rates fixed by the Legislature should be a judicial question to be determined by the courts. At common law common carriers are required to make reasonable charges, and extortionate charges can be. restrained by the courts, and at common law, therefore, the reasonableness of charges is a judicial question, but the State in its sovereign capacity has the power to fix rates and to authorize them to be charged, · and to place them beyond the power of the interference of the courts on the ground that they are extortionate. Statutory rates, except for some constitutional or statutory provision so authorizing, cannot be adjudged by the courts to be extortionate. Rates established by the Legislature under said section 14 cannot be adjudged extortionate by the courts.

There are constitutional limitations upon the power of the Legislature to regulate rates, but they are not found in said section 14.

It is now firmly established that the provision of the Fourteenth Amendment to the Constitution of the United States that forbids the taking of private property without due process of law, prohibits the State from confiscating the use of the property of any public service corporation by fixing rates so low as to deprive such corporation of reasonable compensation for such use, and that the reasonableness of the compensation is a judicial question. [Chicago, etc., R. R. v. Minnesota, 134 U. S. 418; Chicago, etc., R. R. v. Wellman, 143 U. S. 339; Reagan v. Trust Co., 154 U. S. 362; St. Louis, etc., R. R. v. Gill, 156 U. S. 649; Covington Turnpike Co. v. Sandford, 164 U. S. 578; Smyth v. Ames, 169 U. S. 466; San Diego Land Co. v. National City, 174 U. S. 739; Cotting v. Stock Yards Co., 183 U. S. 79; Stanislaus County v. San Joaquin Co., 192 U. S. 201; Ex parte Young, 209 U. S. 123; Knoxville v. Knoxville Water Co., 212 U. S. 1; Willcox v. Consolidated Gas Co., 212 U. S. 19.]

In all of those cases the plenary power of the

State to regulate the rates of public service corporations is fully recognized, but it is held that such power is so limited and restricted by said provision of the Federal Constitution that, in the exercise of it, the State cannot take the use of the property of such a corporation for the public without just compensation, and in all those cases it is conceded that the rates -established by the State, subject to that exception, are controlling and beyond the interference of the courts. The patrons of the public service corporation cannot complain that the statutory rates are too high. In that regard the reasonableness of the rates is conclusively established by legislative enactment. The corporation is not bound by the established rates simply because it has the right to receive reasonable compensation for the use of its property under a requirement to that effect by the Federal Constitution, and the right to a decision of the courts as to whether that requirement has been complied with. Just as the question of the reasonableness of the compensation in all cases where private property is taken for public use, is a judicial question, and regardless of the form of the proceeding in which said question arises, the proceeding is judicial and removable as such to the Federal courts. [Madisonville Traction Co. v. Mining Co., 196 U. S. 239; Mason City R. R. v. Boynton, 204 U. S. 570.] But except for that constitutional requirement, the reasonableness of such rates is purely a legislative question.

A like restriction, of course, is imposed upon the power of the Legislature to establish rates by sections 20 and 21 of article 2 of our Constitution, which prohibit the taking of private property without just compensation, and section 30 of said article, which provides that no person shall be deprived of his property without due process of law. What has just been said about the restriction upon such power imposed by the Federal Constitution applies to those provisions of our

own Constitution. Their effect is to make the reasonableness of such rates a judicial question only when the rates are attacked by the corporation as confiscatory.

The constitutional limitations mentioned cannot be held to protect railroad companies in making any given discriminations prohibited by the Legislature, on the ground that they are just, unless it can be maintained that the refusal of the State to permit said discriminations is in effect the confiscation of the railroads or of the use thereof. It is perfectly clear that no such position can be maintained. It is not such confiscation for the State to establish and enforce a uniform and rigid rule of equality in rates between all individuals and localities, without exception and regardless of differences in conditions. Such a rule may be unwise, and may result in inconvenience and injustice, and may even destroy and prevent, in many instances, the equality sought to be enforced by the rule itself. But in no sense is it the taking of the property of the railroads.

Therefore, if section 14 of said article of the Constitution stood alone, and not with section 12, I should hold that it created no limitation upon the legislative power of the State.

Mention, however, should be made of the case of W. U. Tel. Co. v. Pub. Co., 44 Neb. l. c. 335, wherein a constitutional provision similar to that of Illinois was given the same construction as that given by the Illinois court. The Nebraska court held that had there been no such provision in the Constitution of that State, the Legislature would have had power to prevent any discrimination, but that said provision, on the principle of the maxim, *expressio unius*, etc., must be held to limit the power of the Legislature to the prevention of unjust discriminations, that is to say, to discriminations adjudged by the courts to be unjust.

For the reasons heretofore given I am of the contrary opinion.

But the two sections must be construed together, and construed together there is no doubt about the matter, in my mind.

There is nothing in the opinion of Judge NAPTON in Sloan v. Pacific Railroad, 61 Mo. 24, inconsistent with any of the views expressed herein. There is not even a dictum contained in said opinion against any of these views. The only point decided in that case was that the railroad company had a valid contract authorizing it to regulate its rates until a fixed date that had not yet arrived. What is supposed to be a dictum against the power of the Legislature to enact the Act of 1872 against railroads generally is the expression of Judge NAPTON: "The Act of 1872 undertakes to define the obligations of railroad companies and to declare that a charge for one distance, if it exceeds a charge for a longer one, is an unjust discrimination. It may be so; but whether it is or not, is a question for the courts to decide and not the Legislature. The Act of 1872 declares that such discrimination is an unjust one, without regard to any circumstances whatever." That expression should not be read separate and apart from its context. The very next words of Judge NAPTON show that he meant to say that the common law rule declared by him in said expression, and not the Act of 1872, was in force as to the Pacific Railroad Company *because of said contract.* Continuing, Judge NAPTON said: "In other words, the Legislature, by this act, assumes a power which the *charter had originally granted to the company,* and which the Act of 1868 had continued to confide in the company for ten years after the passage of that act, and the only question is whether the Act of 1868, under which this road is now held, is a valid act; for if it is, then primarily, the

defendant is invested with the power to fix its rates of freight and passage, subject to such police regulations as the State always retains power to make." Judge NAPTON then proceeded to discuss the question of the police power of the State as affected by said contract, and in effect held that the Legislature could not, as against the Pacific Railroad, until after the expiration of said contract, abrogate the principles of the common law applicable to discrimination by railroad companies. He said that any citizen had the right to hold the company liable for unjust discrimination, but that the Legislature had no power to pronounce unjust certain discriminations made by the company, *because of said contract with the company,* and in conclusion said: "An arbitrary rule was adopted by the Legislature determining that certain rates were unjust. Whether they were so or not was a matter depending on circumstances, of which the Legislature were not made judges. The liability of the defendant *at common law and on general principles not abrogated by the Legislature* [because of said contract], was a matter for the determination of courts of justice with the aid of juries." There was in all this no intimation that had there been no contract, the Pacific Railroad would not have been bound by the Act of 1872, or that the Legislature was without power to enact it.

I have not considered the policy of the Act of 1872. Because it must be axiomatic in every government existing under a written Constitution, that every rule clearly established by the Constitution ought to be enforced by the courts in its true spirit without regard to their opinion of the wisdom of the rule. The people make the Constitution. They alone can amend or repeal it, and the courts would interfere with the people's prerogative were they by unfriendly construction to limit or hinder the enforcement of any constitutional rule according to its true spirit. Courts have

said that such a construction of a constitutional provision should not be made as would lead to unjust and inequitable consequences, or to a manifest absurdity. [Fusz v. Spaunhorst, 67 Mo. 256.]    But where the meaning of the constitution is plain and unequivocal, and its intention clear and unmistakable, the courts have nothing to do with the policy of the rule established, and they should accept the spirit of the rule as well as its letter, and enforce it as if they believed in its wisdom.    There should be no half-hearted support of the Constitution or half-hearted enforcement of its commands by the courts.    The mandates of the constitution should be regarded by the courts, established under its provisions, as sacred, and should be enforced zealously.    This court has said, in speaking of the power of the courts to construe constitutional provisions: "In exercising that power the courts should take a large and comprehensive view of constitutional language, mindful that 'every scripture is to be interpreted by the same spirit which gave it forth,' and with a deep desire to enforce its full and exact meaning."    [Wells v. Railroad, 110 Mo. l. c. 297.]

In Hills v. Chicago, 60 Ill. 86, 91, the court said: "When a particular act is inhibited by the clear and unambiguous language of the Constitution, the policy of such inhibition, or the inconvenience that may ensue from its enforcement, is a matter with which the court has no concern; its duty is simply to *reverently* recognize and faithfully *enforce.*"

IV.    It is next insisted that the Act of 1872, and section 12 of article 12 of our Constitution, construed as above, are in conflict with article 5 and section 1 of article 14 of the amendments to the Constitution of the United States.

The Fifth Amendment relates only to acts of Congress, and therefore is not in point.

Something was said in the preceding paragraph

hereof in relation to the due process of law required by the Fourteenth Amendment, but something further should be said upon the subject. Defendant's counsel contend that the railroads have the same constitutional right to a decision of the courts upon the question as to what is just discrimination that they have upon the question as to what is reasonable compensation for property taken for public use or for the use of property already devoted to the public use.

In L. & N. Railroad v. Kentucky, 183 U. S. 503, the Supreme Court of the United States denied a like contention, and held that, in the absence of a valid agreement protecting it from interference on the part of the State in this regard (if indeed such an agreement could be made, which was not decided), a railroad company has no constitutional right to discriminate either between individuals or localities, and that the State has the constitutional power to prohibit absolutely all such discriminations. In small part the court said: "It is said that, while it is true that railroad companies receive their right to exist and to maintain their roads from the State, yet their ownership of such roads is *property,* and, as such, is protected from arbitrary interference by the State. But though it be conceded that ownership in a railroad is property, it is property of a kind that is subject to the regulations prescribed by the State. . . . What we now say is that a state corporation voluntarily formed cannot exempt itself from the control reserved to itself by the State by its Constitution, and that the plaintiff in error, if not protected by a valid contract, cannot successfully invoke the interposition of the Federal Courts, in respect to the long and short-haul clause in the State Constitution, on the ground simply that the railroad is property. Nor is there any foundation for the objection that the provision in question denies to the plaintiff in error the equal protection of the laws. The evil sought to be prevented was the use of

public highways in such a manner as to prefer, by difference of rates, one locality to another, and the remedy adopted by the State was to declare such preferences illegal, and to prohibit any person, corporation, or common carrier from resorting to them. . . The practical inefficiency of this remedy to reach the desired end, and the resulting injury to the welfare of both the producers and the consumers of an article like coal, when brought into competition with coal brought from without the State, are strongly urged on behalf of the plaintiff in error; but however well founded such objections may be, they go to the wisdom and policy of the enactment, not to its validity in a Federal point of view. The *people* of Kentucky, if it can be shown that their laws are defective in their conception or operation, have the remedy in their own hands." [183 U. S. 513-514.]

The court expressly denied that the doctrine established in a long line of its decisions, that a State cannot deprive a public service corporation of the use of its property under the guise of unreasonable rates, has any application to this objection. [183 U. S. 510-511.] It recognized the power of a state absolutely to prohibit all and every kind of discrimination, saying that the provision in the laws of Kentucky authorizing the exoneration of carriers from the operation of the law on certain conditions was *ex gratia*. [183 U. S. 515].

V. It is next objected that the Act of 1872 was repealed by the Act of 1887, and therefore that the former act is without force or effect, even if it was valid as passed, and not afterwards invalid because violative of section 14, article 12 of our present Constitution.

This is the question upon which Court in Banc divided. I approached its consideration with diffidence on that account, but the conclusion reached, in my opin-

ion, is reasonably free from doubt. The only doubt I have is due to the difference among the members of the court upon the question.

In a former suit between these same parties it was decided in Division that the Act of 1872 was not repealed by the Act of 1887. [McGrew v. Railroad, 177 Mo. 533.] The correctness of that decision is now to be decided by the court.

The general rules that prevail in determining whether a given statute has been repealed by a later one upon the same subject have little to do with the determination of the question here, for the reason that the act of 1887, contained a section declaring its purpose and effect as related to other laws then in force. Section 21 of said act is as follows: "This act is not intended to repeal any law now in force, unless in *direct* conflict therewith, but is intended to be supplemental to such laws."

Said section furnishes the sole and only test for determining whether the Act of 1872 was repealed by the act of 1887. There could be no repeal by *implication* in the face of that *express* provision in the Act of 1887. There could be no repeal under any general rule for the construction of statutes in the face of the specific and particular rule established in said act itself. There could be no repeal contrary to that declared intention of the Legislature. [Ex parte Yerger, 8 Wall. 85, 105 (opinion by Mr. Chief Justice CHASE); Patterson v. Tatum, 3 Sawy. 164, 169-170 (opinion by Mr. Justice FIELD); People v. Harris, 123 N. Y. 70 (opinion by Chief Justice RUGER); Robinson v. Rippey, 111 Ind. 112 (opinion by Judge ELLIOTT); 1 Lewis's Sutherland, Stat. Cons. (2 Ed.), 272; 26 Ency. Law (2 Ed.), 733.]

The question, therefore, is, are the two acts in direct conflict so that both cannot stand, or is it possible for them both to stand, and the later be treated as supplemental to the earlier?

It is not necessary to say that this question should be decided without any regard whatever to our views of the merits of the policy inaugurated by the Act of 1872 (Robinson v. Rippey, 111 Ind. 112) ; and we should take up the consideration of the question with the remark of Mr. Chief Justice CHASE in mind that "addition is not substitution" (Ex parte Yerger, 8 Wall. l. c. 105).

The Act of 1887 was passed at an extra session of the Legislature called by Governor Marmaduke by a proclamation which thus stated the matters for action at such session.

"To provide the legislative enactments necessary or expedient to enforce and execute those laws and principles, with reference to railways and railroad companies, which the people themselves have enacted and declared in their Constitution." [House Journal, Extra Sess., 1887, p. 3.]

When the Legislature met, May 11, 1887, the Governor communicated a special message, in which he elaborated the program indicated in his proclamation, but did not enlarge it. He spoke of the demands expressed by the people in the Constitution twelve years previously for legislation "affecting railroads as public highways, and railroad companies as common carriers;" he declared that those demands had been too long neglected, and, without making any specific mention of what said demands were, he referred the Legislature to his recent biennial message for a statement of them.

In that message under the heading "Railroads," the Governor had called the particular attention of the Legislature to certain provisions of the Constitution in the following words:

"I call your particular attention to the following sections of article 12 of our Constitution: 'Section 7, prohibiting corporations from engaging in other business than that expressly authorized in its charter,' also,

section 8, fixing the conditions under which corporations may issue stock or bonds, and prohibiting all fictitious increase of stock; also, and very especially, section 14, which declares railways to be public highways, and the companies operating them common carriers; it also directs the General Assembly to pass laws to correct abuses and to prevent unjust discrimination and extortion, and to fix maximum rates and charges and 'enforce all such laws by adequate penalties;' also section 17, which prohibits the consolidation of parallel or competing lines under one management; also, section 22, which prohibits the president and other officers of any railroad company being interested, directly or indirectly, in furnishing material or supplies to such company; also, section 24, which prohibits railroad and other transportation companies from granting free passes or tickets 'to members of the General Assembly or members of the Board of Equalization, or any state or county or municipal officer.' ''

It was in compliance with said proclamation and messages that the Legislature passed the Act of 1887, entitled, "An Act to Regulate Railroad Corporations."

It is most significant that the Governor made no mention of section 12 of article 12 of the Constitution. He called attention to six other sections of said article, but said nothing about that section. He must have been familiar with that section, and he must have been familiar with the Act of 1872, whose provisions formed a part of the Revised Statutes of 1879 (sec. 820). Having in mind the failure of the Legislature to carry out the injunctions imposed upon it by the provisions of section 14 to enact certain legislation, he surely would have said something about the legislation enjoined upon the Legislature by section 12 for the enforcement of its provisions, if he had not thought that the Act of 1872 was a sufficient enforcement of them. Whatever may be the explanation, the significant fact

is that the Governor made no mention of the short-haul rule covered by section 12 and the Act of 1872.

Another important fact to be borne in mind is, that the Governor's entire effort was to secure omitted legislation, not to correct defective legislation already enacted. He sought new laws; not the repeal of existing laws.

No intimation is intended that, under said proclamation and messages, the Legislature in special session could not have repealed the Act of 1872 had it deemed it proper so to do, in enacting the legislation which it had been called upon to enact; but the facts mentioned furnish strong argument in favor of the proposition that the Legislature, by the Act of 1887, did not intend to repeal the Act of 1872, but did intend to make the former act supplemental to the latter.

The Act of 1887 was quite comprehensive. It contained 21 sections. And it covered all sorts of discrimination, including both discrimination against localities and against individuals.

It is manifest that said act, so far as it concerned discrimination against individuals, was not in conflict with the Act of 1872, which was wholly confined to local discriminations. As to all individual discriminations the Act of 1887 was supplemental to the Act of 1872. No argument seems necessary to establish this self-evident proposition.

All the local discriminations covered by the Act of 1887 are discriminations under "like circumstances" or "substantially similar circumstances and conditions." The Act of 1872, as construed by everybody, ignores circumstances and conditions, and prohibits the forbidden things, regardless of circumstances and conditions. The Act of 1887 has a short-haul section, but it is confined to hauls in the same direction under similar circumstances and conditions. [Laws 1887, sec. 4, p. 17; R. S. 1899, sec. 1134.] As hereinbefore

frequently and as just stated, the short-haul section of the Act of 1872 is not confined to any direction or circumstances and conditions, but includes all hauls in every direction and under all circumstances and conditions. That is to say, the Act of 1887 forbids a railroad company to receive "any greater compensation in the aggregate for the transportation of like kinds of property under similar circumstances and conditions for a shorter than a longer distance over the same line in the same direction" (Id.), while the Act of 1872 prohibits a railroad company to receive for the transportation of property any greater amount as compensation than is charged for the transportation of the same class of property over a greater distance upon the same road, without regard to direction or circumstances or conditions.

It is plain to me that there is no necessary conflict between the two acts in regard to the short-haul clause. Both acts can stand. It is, of course, plain that anything in this regard covered by the Act of 1887 is also covered by the Act of 1872, because a haul in the same direction and under similar circumstances and conditions, in the meaning of the former act, must be a haul in some direction and under some conditions, in the meaning of the latter act. But that does not create conflict. Two laws do not conflict with each other simply because they "establish the same right or provide redress for the same wrong," and in such a case, "the person seeking to enforce the right or avenge the wrong may proceed on the law he chooses." [Bishop's Written Laws, sec. 163d; Robinson v. Rippey, 111 Ind. 112.] In the case last cited Judge ELLIOTT said, among other things: "The fact that both of the statutes are directed to the attainment of the same end does not warrant the conclusion that the later repeals the former. Statutes constructing two systems for the government of the same subject may both stand. [Beals v. Hale, 4 How. 37; Wood v. United States, 16 Pet. 342, 363;

Daviess v. Fairbairn, 3 How. 636; Raudebaugh v. Shelley, 6 Oh. St. 307.]''

The acts of 1872 and 1887 created two systems for preventing discrimination by railroad companies. The system created by the latter act contains some but not all of the things contained in the system created by the former act, and many other things. The systems are by no means identical, and they do not conflict with each other.

What if a violation of the short-haul section of the Act of 1887 also violates the Act of 1872? The person injured by said violation can proceed under the Act of 1872, and the fact that the matter or thing complained of also constitutes a violation of the Act of 1887 will not prevent his recovery. Take the case at bar. The allegations in every count of the petition show a violation of the Act of 1872 and not of the Act of 1887, for the reason that there is, except in one count, no allegation that the longer and shorter hauls were in the same direction, and in none of the counts is there any allegation that the hauls were under the same or like circumstances and conditions. Proof of said omitted fact would not have defeated plaintiff's recovery. Such proof would have been essential to a recovery under the Act of 1887, but such proof would not have prevented a recovery in the case at bar, founded on the Act of 1872.

This is precisely the view taken of a similar situation by Mr. Justice Story in Wood v. United States, 16 Pet. 342, 363. The question there was whether certain sections of an act of Congress of 1830 and 1832 were repugnant to a certain section of the act of 1799. He said in part: ''In truth, however, there is not the slightest repugnancy between these sections of the acts of 1830 and 1832, and the sixty-sixth section of the Act of 1799. The former apply only to cases where there has been an opening and examination of the packages imported, before they have passed from the cus-

tody, of the custom-house; and in the course of such examination, the fraudulent intent in the making up of the package or invoice has been detected; and thereupon it declares the same to be forfeited. Now, the sixty-sixth section of the Act of 1799 may cover the same cases, but the forfeiture is the same; and therefore the provisions in such a case may well be deemed merely cumulative, and auxiliary to each other. But the sixty-sixth section is not confined to such cases. On the contrary it covers all cases where the goods have entered, and have passed from the custom-house without any examination or detection of the false invoices. It is, therefore, much more broad in its reach. To enforce a forfeiture under the sections of the acts of 1830 and 1832, it would be necessary to allege, in the information or libel, all the special circumstances of the examination and detection of the fraud, under the authority of the collector; for they constitute a part of the *res gestae,* to which the forfeiture is attached. But under the sixty-sixth section, no such allegations would be necessary or proper, as the forfeiture immediately attaches to every entry of goods falsely and fraudulently invoiced, without any reference whatever to the mode or the circumstances under or by which it is ascertained.''

The fact that the penalties created by the two acts are different is immaterial. In order to enforce the penalties prescribed by the Act of 1887 for violating its short-haul section, it is necessary to allege and prove that the shorter and longer hauls were made in the same direction and under similar circumstances and conditions. Such allegations and proof would not be needed to enforce the penalty prescribed by the Act of 1872, and in a proceeding to enforce the latter penalty it would be no defense to show the facts making the defendant liable to the other penalties. Just as in

230 Sup—35

a proceeding against one for a common assault, it is no defense to prove that the assault was felonious.

This principle has been recognized by the Supreme Court of the United States in Beals v. Hale, 4 How. 37, 53. In that case the court referred to a number of cases cited in Coke, and added: "Among them is one where an act of parliament made an offense punishable at the quarter sessions, and another passed making it punishable at the assizes, without any words of repeal. It was held that you may indict under either or at either court. [11 Coke 63.]"

For these reasons I think that McGrew v. Mo. Pac. Ry. Co., 177 Mo. 533, was correctly decided.

There was an inaccuracy in the opinion in that case which, in my opinion, was not of controlling importance. Mention of it is now made because of the importance given to it during the discussion of the present case. It was stated that section 1126, Revised Statutes 1899, which was section 1 of the Act of 1872, was passed in obedience to the mandate of section 12 of article 12 of the Constitution. The statement was made as a "cogent reason" why the Act of 1872 was not repealed by the Act of 1887. The statement was, of course, erroneous, for the reason that the Act of 1872 antedated the Constitution, but to my mind the error is of no importance. The important fact is that the Act of 1872 was deemed, in a great measure, to be an enforcement of said section 12 of article 12 of the Constitution, and it was argued that for that reason its repeal was not probable.

VI. The petition was framed upon the Act of 1872, but in view of the fact that the trial court denied the penalties asked, and allowed only the difference between the higher rates charged plaintiff and the lower rates charged by defendant for the longer distances, the judgment could be sustained upon section 12 of article 12 of the Constitution, without the aid of the

Act of 1872, provided that said section of the Constitution is self-enforcing.  Because if said section is self-enforcing, that is to say, if it, without the aid of any statutory enactment, makes it unlawful for a railroad company to charge more for a shorter haul than a longer one of the same class of property in any direction, the same or not, and under any or all circumstances and conditions, then clearly the measure of damages for doing the unlawful thing, in the absence of any statute upon the subject, is the amount of the excess charged for the shorter distance over that charged for the longer distance.  [W. U. Tel. Co. v. Pub. Co., 44 Neb. 346.]

For this reason it seems important to determine whether said section of the Constitution is self-enforcing.

Much has been said by courts and text-writers upon the question as to what constitutional provisions are and what are not self-enforcing or self-executing. It is not thought necessary to go into this subject with the purpose of endeavoring to state a rule that will reconcile all the authorities or that will determine all cases that may hereafter arise.

It must be conceded by all that wherever the Constitution of a State establishes a rule creating a new right so that, had the right, as created by the Constitution, existed at common law, it could have been enforced by some common law action, then the constitutional provision is self-enforcing to the extent of authorizing its enforcement by an appropriate action at law.  And it matters not that the Legislature might be able to supply other and better methods for protecting or enforcing said right, or even that the Legislature should be directed by the Constitution itself to pass suitable laws for enforcing the rule established by it.  If the right be clearly created by the Constitution, it can be enforced in the courts without legislative action.  The courts will find a remedy, and will

not permit the Legislature to destroy the right by failure to act, any more than by affirmative action. Constitutional rights are above legislative destruction or impairment, by action or non-action.

In Householder v. Kansas City, 83 Mo. 488, the question was as to the self-executing character of the following provision of our Constitution:

"Private property shall not be taken or damaged for public use without just compensation. Such compensation shall be ascertained by a jury or board of commissioners of not less than three freeholders, *in such manner as may be prescribed by law;* and until the same shall be paid to the owner or into court for the owner, the property shall not be disturbed or the proprietary rights of the owner therein divested." [Const., art. 2, sec. 21.]

The court was composed of Judges HOUGH, HENRY, NORTON, RAY and SHERWOOD. In an opinion by Judge HENRY, concurred in by all, it was held that said provision is self-executing. It was said in the opinion that the clause relating to the ascertainment of compensation was intended to authorize the Legislature to prescribe an exclusive method of ascertaining the damages, under the limitations named, but that the failure of the Legislature to prescribe any method could not be permitted to deprive the owner of the property taken or damaged for public use of just compensation; that the first clause of said section gave him an unconditional right to such compensation; that the failure of the Legislature to prescribe a statutory method for the ascertainment of said compensation affected the remedy only and not the right; and that the owner of said property could maintain an action at common law for the value of his property taken. This in accordance with the settled rule of law that there is and can be no such thing as a legal right without a remedy for its enforcement, which Judge HENRY stated in these words: "Wherever a statute or the organic law creates a

right, but is silent as to the remedy, the party entitled
to the right 'may resort to any common law action
which will afford him adequate and appropriate
means of redress.' '' That case has been followed and
approved in the following cases, among others: Sheehy
v. Railroad, 94 Mo. 574; Keith v. Bingham, 100 Mo.
300; Hickman v. Kansas City, 120 Mo. 117; Sharp v.
National Biscuit Co., 179 Mo. 553; Cummings v. Winn,
89 Mo. 51. The Householder case states the recog-
nized doctrine in this state, and the doctrine sustained
by reason and the overwhelming weight of authority.

In the previous case of St. Joseph School Board
v. Patten, 62 Mo. 444, it was held in an opinion by
Judge NAPTON, concurred in by Judges SHERWOOD and
HOUGH, that our constitutional provision limiting the
rate of taxation for school purposes, with the proviso
that the rate might be increased in certain classes of
school districts on the condition that a majority of the
taxpayers voting at an election to be called to decide
the question, vote for said increase, was self-executing,
and that the failure of the Legislature to provide for
an election on this question of such increase did not
affect the self-executing character of said provision.

But in another prior case this court had rendered
a decision out of line with the doctrine announced in
the Householder case. In Fusz v. Spaunhorst, 67 Mo.
256, the question was whether the following provision
of our Constitution was self-executing so as to make
the officers of the bank liable under its provisions:

''It shall be a crime, the nature and punishment of
which shall be prescribed by law, for any president, di-
rector, manager, cashier or other officer of any bank-
ing institution, to assent to the reception of deposits,
or the creation of debts by such banking institution,
after he shall have had knowledge of the fact that it is
insolvent, or in failing circumstances; and any such
officer, agent or manager shall be individually respon-

sible for such deposits so received, and all such debts so created with his assent." [Art. 12, sec. 27.]

This court held in an opinion by Judge SHERWOOD, concurred in by Judges NAPTON, HOUGH, NORTON and HENRY, that the provision making the officers of the failing bank liable is not self-executing. The opinion was based largely upon the first part of the section, "'It shall be a crime, the nature and punishment of which shall be prescribed by law," etc., which, of course, was not self-executing, and it was argued that neither was it intended to make the *civil* part of the section self-executing. Groves v. Slaughter, 15 Pet. 449, was cited among other cases in support of the court's opinion. The Fusz case is no longer recognized as the law in this State, any more than is Groves v. Slaughter recognized as having been correctly decided.

In Cummings v. Winn, 89 Mo. 51, 56, Judge HENRY said that he had concurred in the opinion in Fusz v. Spaunhorst, but had become satisfied that said opinion was erroneous, citing the Householder case in support of his present conviction. Speaking of the section of the Constitution involved in the Spaunhorst case, he said that the first clause declaring "it shall be a crime, the nature and punishment of which shall be prescribed by law," etc., is clearly not self-executing, but that the last clause is. He added: "It declares the individual responsibility of the guilty officer—confers a right upon the depositor, or creditor, to recover from such officer his debt or deposit. When the law gives a right but prescribes no remedy, any common law action may be resorted to, adapted to the case, and under our code there can be no difficulty as to the remedy. We have in this State 'but one form of action for the enforcement or protection of private rights, and redress or prevention of private wrongs, which shall be denominated a civil action.' [Sec. 3641, R. S. 1879.]"

In Sharp v. National Biscuit Company, 179 Mo. 553, it was held that the amendment to our Constitution

authorizing three-fourths of a jury in civil cases in courts of record to render a verdict is self-executing. In the opinion in that case Fusz v. Spaunhorst was treated as having been overruled in Cummings v. Winn, 89 Mo. 51.

In State ex rel. v. Lesueur, 145 Mo. 322, it was held by a unanimous opinion by Court in Banc that the constitutional provision that "no corporation . . . shall be created or organized, . . . unless the persons named as corporators shall . . . pay into the State Treasury fifty dollars for the first fifty thousand dollars or less of capital stock" is self-executing.

Section 6 of article 12 of the Constitution, in relation to cumulative voting in corporations, has been assumed to be self-executing. Judge GANTT said in Gregg v. Granby Co., 164 Mo. l. c. 626, that said section *granted* the right to each shareholder to vote on the cumulative plan.

In State v. Warner, 165 Mo. 399, it was held that the provision of the Bill of Rights in our Constitution that "in criminal prosecutions the accused shall have the right to appear and defend in person and by counsel," is self-executing. In the opinion it was said, in part, that "whenever a constitutional right, such as is now under discussion, has no statute specially adapted to enforce it, by its own inherent potency, and leaning not on the adventitious aids of statutory regulation, it supplies the lack of statutory provisions and enforces itself." [165 Mo. 414-415.]

In State v. Kyle, 166 Mo. 287 (*in Banc*), in an opinion by Judge BURGESS, concurred in by all the other judges, it was held that the amendment to our Constitution, making indictment and information concurrent remedies in prosecutions for felonies, is self-executing. Judge BURGESS said that there are a number of provisions in our Constitution that are self-executing, and that require no legislation to put them in operation, and that the test in all cases involving this question is,

can the provision in question be enforced without legislation?

In Evans v. McFarland, 186 Mo. 703, 727 (*in Banc*), it was held that the provision of our Constitution that fixed a maximum of indebtedness which any municipal or political corporation or subdivision of the State can incur, provided that such corporation or subdivision can assent to an increase on indebtedness beyond said maximum amount, but provided further that any such corporation or subdivision shall, before or at the time of giving such assent, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment thereof, etc., is self-executing. To a like effect is East St. Louis v. Amy, 120 U. S. 600.

The courts elsewhere in this country quite generally announce the same doctrine.

The Constitution of Maryland contained the following provision:

"The rate of interest in this State shall not exceed six per cent per annum, and no higher rate shall be taken or demanded, and the Legislature shall provide, by law, all necessary forfeitures and penalties against usury."

Mr. Chief Justice TANEY held on the circuit that said provision was self-executing, and that a note bearing usurious interest was void *in toto*. [Dill v. Ellicott, Taney (U. S.) 233, 7 Fed. Cas. No. 3, 811.] Subsequently the Court of Appeals of Maryland decided that said provision was self-executing, but that it avoided only so much of the contract as provided for excessive interest. [Bandel v. Isaac, 13 Md. 202.] Chief Justice LE GRAND said in small part: "The thing forbidden by the Constitution is the taking or demanding a *higher* rate of interest than six per cent: it is not forbidden to take or demand that or a lesser rate. The thing forbidden is the excess and nothing else, and that is

what is illegal and void, and it is within the province of the Legislature to punish this illegality by forfeitures and penalties.  Whilst the Constitution makes it competent to the Legislature 'by law,' to forfeit the whole, or any part, of the money loaned, and in addition to impose a penalty, yet, until it does exercise this office, all that is 'avoided' by the Constitution is the excess beyond the six per cent."   [p. 221.]

A like provision of the Constitution of Texas has been held to be self-executing, and the view of Chief Justice TANEY is there taken.   [Watson v. Aiken, 55 Tex. 536; Hemphill v. Watson, 60 Tex. 679; Quinlan's Estate v. Smye, 21 Tex. Civ. App. 156.]

In Hemphill v. Watson, *supra,* Chief Justice WILLIE said in part: "This provision is prohibitory in its nature and self-executing so far as to render all contracts of the kind denounced immediately illegal; and it left to the Legislature the only remaining duty of saying what penalties should be imposed upon offenders against this clause of the Constitution."

A provision of the Constitution of Illinois that the recorder's court of the city of Chicago should be continued and called the "Criminal Court of Cook County," and should have jurisdiction in all criminal cases and quasi-criminal matters arising in the county of Cook, or which might be brought before it pursuant to law, was held to be self-enforcing. [People v. Bradley, 60 Ill. 390.].

So too was the provision of said Constitution that private property should not be taken or damaged for public use without just compensation, and that such compensation, when not made by the State, should be ascertained by a jury, and should be prescribed by law.   [People ex rel. v. McRoberts, 62 Ill. 38.] In the course of the opinion in the case last cited, the court quoted the words of the Constitution "as shall be prescribed by law," discussed the words somewhat, and said: "The inhibition of any other mode of determin-

ing the compensation is independent of and complete without the words quoted. They merely declare the duty of the Legislature.'' The court also said, speaking of other provisions of the Constitution: ''Section 12 prohibits imprisonment of a debtor, unless upon refusal to deliver up his estate, 'as shall be prescribed by law.' Does the freedom of a citizen from incarceration, therefore, depend upon the action of the Legislature? We apprehend not. He is secure from imprisonment for debt except upon a refusal to surrender his estate for the benefit of his creditors, or there is strong presumption of fraud; and until the manner of surrender is provided by law. Section 16 forbids the quartering of troops in the house of the citizen, even in time of war, 'except in the manner prescribed by law.' The failure to prescribe the manner cannot destroy the prohibition.'' In speaking of the same section of the Constitution of that State the Supreme Court of Illinois in a subsequent case, said: ''It is a constitutional right of which the party may not be debarred, either by the action or non-action of the Legislature.'' The following provision of the Constitution of Illinois has been held to be self-enforcing:

''No county, city, township, school district or other municipal corporation, shall be allowed to become indebted in any manner or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county taxes previous to the incurring of such indebtedness.'' [Law v. People ex rel., 87 Ill. 385.].

In part it was said in the opinion by Mr. Justice WALKER: ''It has also been repeatedly held, and is regarded as settled doctrine, that all negative or prohibitory clauses of this character found in a constitution execute themselves, as legislative provisions, in the same or other language, prohibiting the incurring

of such indebtedness, could be no more binding or forcible than the Constitution itself.''

A provision of the Constitution of Tennessee that ''the Legislature shall have no power to authorize lotteries for any purpose, and shall pass laws to prohibit the sale of lottery tickets in this State,'' was held to be itself a prohibition of lotteries. [Bass v. Nashville, Meigs 421.]

In Mallon v. Hyde, 76 Fed. 388, it was held that the provision of the Constitution of Washington, making individually liable an officer of a bank receiving deposits after he has knowledge of the bank's insolvency, is self-executing. And to the same effect is Rice v. Howard, 69 Pacific 77 (Cal.), in relation to a like provision of the Constitution of California.

The double liability of stockholders of corporations established by constitutional provisions is also held enforcible without legislative enactment in aid of such provisions.

In State v. Woodward, 89 Ind. 110, the court held that the following provision of the Constitution of that State was self-enforcing: ''No lottery shall be authorized, nor shall the sale of lottery tickets be allowed.'' In part the court said: ''We are of opinion that the provision is not a mere check upon future legislation, but an absolute prohibition of lotteries and the sale of lottery tickets. It is so far self-executing as to take away any right or authority that might theretofore have existed to conduct lotteries or sell lottery tickets. Its evident meaning is that from the time of the adoption of the Constitution there should be no authority for conducting lotteries, nor should lottery tickets be sold. It needed legislation, to be sure, to make the conducting of lotteries or the selling of lottery tickets a crime with a prescribed punishment, but the provision effectually took away any authority that might have previously existed to do those things. See Cooley's Const. Lim., [4th Ed.] pp. 99 to 102, and notes; also

the opinion by Mr. Chief Justice SHARKEY, in the case of Brien v. Williamson, 7 How. (Miss.) 14.''

The great case on this subject is Brien v. Williamson, 7 How. (Miss.) 14. The Constitution of Mississippi provided: ''The introduction of slaves into this State as merchandise or for sale, shall be prohibited from and after the first day of May, eighteen hundred and thirty-three: Provided, that the actual settler or settlers shall not be prohibited from purchasing slaves in any State of this Union, and bringing them into this State for their own individual use, until the year eighteen hundred and forty-five.'' The Supreme Court of that State held said provision of the Constitution to be self-executing, and to be a prohibition of the traffic described, and that a note given in part payment for a negro imported by the payee in violation of said provision was void. The court that decided that case consisted of WILLIAM L. SHARKEY, Chief Justice, and EDWARD TURNER and ALEX M. CLAYTON, Associate Justices. Mr. Chief Justice SHARKEY wrote the opinion, in the course of which he said in part: ''We hold the contract void on either of two grounds. First, that the provision in the Constitution of 1832 does *per se* prohibit the introduction of slaves into this state as merchandise or for sale. . . In support of our first position it is proper that we should inquire in the outset what a Constitution is, and how it operates. It is a form of government established by the people, designated for their general welfare as a society and as individuals. In the language of a learned jurist, 'it was made by the people, made for the people, and is responsible to the people.' It is but the frame and skeleton of a government, containing the general outline, leaving the detail to be filled up in subordination and auxiliary to the essential and fundamental principles thereby established. But it is not on that account the less binding. It is from its very nature and object the supreme law of the land, fixed and unalterable, except

by the power that made it. It contains only certain great principles which are to control in all legislation, and extend through the whole body politic. These principles are of themselves laws. Constitutions do not usually profess to insure obedience by prescribing penalties; they merely declare the rule or establish the principle, which being paramount, makes void whatever is repugnant to it. Its mandates or principles bind by a moral power. . . General principles, thought to be essential to a free government, are declared; and (emanating from the sovereign authority) that mere declaration imparts to them all the force of a supreme law. . . . We may safely assert without the shadow of a doubt, that the convention did intend that the importation of slaves into this State as merchandise, should be prohibited after the 1st of May, 1833, either by force of the constitutional provision, or by legislative enactment, and having so intended and declared it through the Constitution, it became as much a fundamental and fixed principle in the government, as any other principle or provision whatever. It became by that mere declaration, *propria vigore* a law, and whether it may be supposed to be *defective in not providing all the means necessary to enforce the prohibition makes no difference,* provided it can by any means be carried into effect. Even if it was intended only as a mandate to the Legislature, its operation was to be on the citizens generally. It was not designed as one of those provisions which expend their whole force in directing and regulating the action of the legislative body, but its design was evidently to protect the people against a supposed evil. A time was fixed at which the evil should be prohibited; and from that time it was a law in full force. The Legislature could not defeat it by removing the prohibition, and this shows that it had an existing operative force. Having that existing operative force, it was not liable to be defeated by omission. It was one of those principles which re-

quired no legislative aid to give it strength, although some may think that its strength was susceptible of a more efficient application by legislative aid. All fundamental principles, whether inherent or otherwise, in any form of government, constitute a part of the law of that government. When the people prescribe their constitutional form of government, they ordain that every part of that form must have its appropriate effect; every principle is to be regarded as fundamental and self-executing.'' In his great opinion (p. 21) Mr. Chief Justice SHARKEY also said: ''The words 'shall be,' when used by a lawmaking power, are words of *enactment; they declare the law.''*

The Mississippi Court had taken the same view of the law in previous cases, but the Supreme Court of the United States had declined to follow the *State* court in the construction of the *State* Constitution. [Groves v. Slaughter, 15 Pet. 449.] Mr. Chief Justice SHARKEY's opinion was written, in effect, in answer to the Supreme Court of the United States. Groves v. Slaughter was decided by a divided court, and the several opinions written therein show clearly that the judgment of the court was the result of the exigencies of the slavery question and to avoid the decision of grave Federal questions.

Mr. Chief Justice SHARKEY's opinion was followed subsequently in cases affected by said provision of the Constitution of Mississippi, in Tennessee (Yerger v. Rains, 4 Humph. 259), and in Arkansas (Moore v. Clopton, 22 Ark. 125, 128), and its correctness, now after the slavery question has passed away forever, is, I believe, tacitly accepted by even the courts of the United States.

In Illinois Cent. Railroad v. Ihlenberg, 75 Fed. 873, in an opinion by Judge TAFT, it was held that a clause of the Constitution of Mississippi which provided that any knowledge by an injured employee of the defective or unsafe condition of machinery should

be no defense to an action for injury caused thereby, was self-executing.

And in Davis v. Burke, 179 U. S. 399, which was an appeal from an order denying a writ of *habeas corpus* to appellant who had been found guilty of murder in the first degree, appellant objected to conviction on the ground, among others, that he had been illegally prosecuted by information, (1) because the constitutional provision of Idaho which in terms permitted prosecution by information was not self-enforcing, and (2) that the statute of that State, known as the Information Act, was void, because not passed in the manner required by said Constitution. The court held that said constitutional provision was self-enforcing. Mr. Justice Brown wrote the opinion of the court. He said in part: "Where a constitutional provision is complete in itself it needs no further legislation to put it in force. . . . In other words, it is self-executing only as far as it is susceptible of execution. But where a Constitution asserts a certain *right,* or lays down a certain *principle of law* or procedure, it speaks for the entire people as their supreme law, and is full authority for all that is done in pursuance of its provisions. In short, if complete in itself, it executes itself. When a constitution declares that felonies may be prosecuted by information after a commitment by a magistrate, we understand exactly what is meant, since informations for the prosecution of minor offenses are said by Blackstone to be as old as the common law itself, and a proceeding before magistrates for the apprehension and commitment of persons charged with crime has been the usual method of procedure since the adoption of the Constitution. It is true the Legislature may see fit to prescribe in detail the method of procedure, and the law enacted by it may turn out to be defective by reason of irregularity in its passage. In such case a proceeding by information might be impeached in the State court for such irregularity, but it certainly would

not be void as long as it was authorized by the Constitution. For us to say that the accused had been denied due process of law would involve the absurdity of holding that what the people had declared to be the law was not the law.''

In Central Iron Works v. Pennsylvania Railroad, 5 Pa. Dist. 247, in an opinion by SIMONTON, P. J., it was held that a provision of the Constitution of Pennsylvania was self-enforcing, that declared that ''persons and property transported over any railroad shall be delivered at any station at charges not exceeding the charges for transportation of persons and property of the same class, in the same direction, to any more distant station.''    Judge SIMONTON said among other things: ''There are undoubtedly many provisions in the Constitution which presuppose and require legislation to carry them into effect, but there are also many, efficient in themselves, which need no aid from legislation. Of these, art. 16, sec. 4, providing for cumulative voting for directors of corporations, is one. [Pierce v. Com., 104 Pa. St. 150.]    Delivering the opinion of the court in this case, GORDON, J., said, at p. 155: 'But it is said this provision is but directory, and it cannot go into effect without legislative action directing the manner of its exercise. To this proposition we cannot assent. . . . The constitutional right is one that belongs solely and exclusively to the individual shareholder. . . . Legislative action is, therefore, uncalled for. . . . With the right itself, the General Assembly cannot meddle.' So, here, the right conserved by the Constitution belongs to each individual shipper, and the ordinary process of the courts is ample for its enforcement. There is, therefore, no necessity for legislative action.''    In further part Judge SIMONTON said: ''Nothing could be added to this [constitutional provision] by an act of the Legislature which would render it more clear or definite, and, as was said in Pierce v. Com., supra, it would not

be in the power of the Legislature to take anything from it.'' Judge SIMONTON further referred to the fact that the provision of the Constitution of Pennsylvania which prohibits the *damaging* of private property without just compensation had been held to be self-enforcing. [Reading v. Althouse, 93 Pa. St. 400; Fredericks v. Canal Co., 148 Pa. St. 317.] And that no one had contended that the provision of said Constitution providing that no existing railroad, canal or other transportation company, should have the benefit of a certain article thereof, except on condition of the complete acceptance of all the provisions of said article, needed legislation to enforce it; and that no claim had ever been made that legislation was necessary to enforce that provision of said Constitution that prohibits the consolidation of competing or parallel lines of transportation.

Section 12 of article 12 of our Constitution clearly establishes an unconditional short-haul rule, without regard to direction or to circumstances and conditions. Said section declares that it *shall be unlawful* for any railroad company to charge for the transportation of freight or passengers a greater amount for a less distance than ''the amount charged for any greater distance.'' That declaration establishes a rule, and creates a right in every passenger and shipper to a compliance with, and an obedience to its terms. The direction to the Legislature that it pass suitable laws to enforce the rule established, contained in said section, did not suspend the rule or right of passengers and shippers to a compliance with its terms, until the Legislature should comply with said direction and pass such laws. Said section has the same force and effect as if it read: ''It shall not be lawful in this State for any railroad company to *charge, under penalties which the General Assembly shall prescribe,* for freight or passengers a greater amount for the transportation of the

same, for a less distance than the amount charged for any greater distance." Had said section read that way, its effect as an operative law would have been too clear for controversy. To my mind it is equally clear under the present reading.

Something was said in argument about said section being too vague and uncertain to be self-executing. But this argument is untenable. Said section is not identical with the Act of 1872. The former includes both freight and passengers, while the latter applies only to freight; the former applies only to hauls for a greater distance, while the latter includes hauls both for a greater and the same distance; and the former applies only to the short-haul rule, while the latter includes both that rule and a provision requiring equality of rates for "receiving, handling or delivering freight at different points" on the same road. All these differences are immaterial so far as concerns the point under discussion. *The words of the section of the Constitution and of the Act of 1872 in defining the greater haul are identical. Nothing is said in either indicating direction or condition and circumstances.* The act has been uniformly construed, in this State and in Illinois, to mean any direction, and any and all circumstances and conditions, and therefore, if the Act of 1872 is sufficiently explicit, so too is the section of the Constitution.

In my opinion plaintiff's judgment can be sustained upon said provision of our Constitution, without the aid of the Act of 1872.

The judgment is affirmed. *Gantt, Valliant* and *Lamm, JJ.,* concur; *Fox, C. J., Burgess* and *Woodson, JJ.,* dissent.

### DISSENTING OPINION.

WOODSON, J.—The respondent instituted this suit in the circuit court of Lafayette county to recover $7,462.43, overcharges and penalties alleged to be due

him from appellant for its violation of certain sections of the Revised Statutes of 1899, regarding freight charges, for transportation of coal from Myrick, Missouri, to various other towns in this State.

There was a trial before the court, without the intervention of a jury, which resulted in a judgment for the respondent for the amount sued for, and the appellant duly prosecuted its appeal to this court.

The facts are undisputed, and are substantially as follows:

The respondent is a coal miner and shipper at Myrick, Missouri; and appellant is a railroad corporation. duly organized and incorporated under the laws of this State; Myrick and the other towns mentioned are located along the line of said railroad; respondent made divers shipments of coal over said road to the said various towns. The suit is to recover overcharges and penalties for the alleged violation of sections 1126 and 1160, Revised Statutes 1899, prohibiting railroads from exacting a higher toll for carrying freight from one point to another in the State than they charge for the same class and quantity of freight carried a greater distance. The appellant collected of respondent certain sums in excess per ton for said shipments than it did for the same class and quantity of coal shipped for longer distances, aggregating the sum sued for.

At the close of the testimony counsel for the plaintiff prayed the court to grant this instruction on the part of the plaintiff: "The court declares the law to be that upon the pleadings and the evidence herein the finding and judgment must be for the plaintiff," which was by the court given. To the giving of which instruction on the part of the plaintiff, the defendant by its counsel then and there duly excepted.

The respondent bases his cause of action upon sections 1126 and 1160, Revised Statutes 1899, which are as follows:

"Sec. 1126. No railroad corporation organized or doing business in this State, under any act of incorporation or general law of this State now in force, or which may be hereafter enacted, shall directly or indirectly charge or collect for the transportation of goods, merchandise, or property on its said road for any distance, any larger or greater amount as toll or compensation, than is charged or collected for the transportation of similar quantities of the same class of goods, merchandise or property over a greater distance upon the same road, nor shall such corporation charge different rates for receiving, handling or delivering freight at different points on its road or roads connected therewith, which it has a right to use, nor shall any such railroad corporation charge or collect, for the transportation of goods, merchandise or property over any portion of its road, a greater amount as toll or compensation than shall be charged or collected by it for the transportation of similar quantities of the same class of goods, merchandise or property over any other portion of its road of equal distance; and all such rules, regulations or by-laws of any railroad corporation, as fix, prescribe, or establish any greater toll or compensation than is hereinbefore prescribed, are hereby declared to be void.

"Section 1160. Any railroad corporation which shall fix, demand, take or receive, from any person or persons, any greater toll or compensation for the transportation, receipt, handling or delivery of goods or merchandise, in violation of the provisions of this article, shall forfeit and pay for any such offense any sum not exceeding one thousand dollars, and costs of suit, including a reasonable attorney's fee, to be taxed by any court where the same is heard by appeal or otherwise, to be recovered by civil action by the party aggrieved, in any court having jurisdiction thereof; and any officer, agent or employee of any such railroad corporation who shall knowingly or wil-

fully violate the provisions of this article shall be liable to the penalties prescribed in this section.''

It will throw some light upon the legal propositions involved in this suit if we will bear in mind the history of this legislation. The two sections above quoted were originally enacted in 1872, and were sections 1 and 4 of that act [Laws of 1871, pp. 67 and 70]. Without alteration they were brought forward and incorporated in the Revised Statutes of 1879, and are therein numbered sections 820 and 822, respectively. They were again brought forward without any change into the Revised Statutes of 1889, and are sections 2629 and 2663, and were in like manner brought forward into the Revised Statutes of 1899, and are now sections 1126 and 1160. Briefly stated, sections 1 and 4 of the Act of 1872 have been brought forward through all the revisions of the statutes without change down to and including the revision of 1899, and are numbered therein sections 1126 and 1160.

The appellant assails the constitutionality of those statutes for the reason that they were not enacted in accordance with the requirements of section 32, article 4, of the Constitution of 1865. That section reads as follows: ''No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title; but if any subject embraced in an act be not expressed in the title, such act shall be void only as to so much thereof as is not so expressed.''

The title to the Act of 1872 is as follows: ''An Act to prevent unjust discrimination and extortion in the rates to be charged by the different railroads in this State, for the transportation of freight on said roads.''

The appellant contends that the title of the act is directed against *unjust discriminations,* while the act itself prohibits *all discriminations whether just or unjust.* The appellant insists that if the validity of that act is tested by the constitutional provision before quoted, then that portion of the act which prohibits *all*

discrimination is void and inoperative, for the reason it is not mentioned in the title of the act.

The title of the Act of 1872 does not purport to prohibit *all* discrimination in the transportation of freight, but in express terms directs its inhibition against *unjust* discrimination only. The principle of *expressio unius est exclusio alterius* applies here, and there is no possible escape from the conclusion that all discrimination is not embraced in the title of the Act of 1872. Having shown that the title of the act in question does not prohibit *all* discrimination by railroads in the shipment of freight, it would seem to be useless to cite authorities to sustain the proposition that such portion of the act which attempts to do so, is in the language of the Constitution, 'void' and inoperative; but since the majority of the court entertain different views regarding the legal questions involved in this case, I feel called upon to fortify each and every proposition that I shall present herein with an abundance of authority.

In consideration of that provision of the Constitution, this court in the case of St. Louis v. Weitzel, 130 Mo. l. c. 616, used the following language: "The evident object of the provision of the organic law relative to the title of an act was to have the title, like a guide board, indicate the general contents of the bill, and contain but one general subject which might be expressed in a few or a greater number of words. If those words only constitute one general subject, if they do not mislead as to what the bill contains; if they are not designed as a cover to vicious and incongruous legislation, then the title can stand on its own merits, is an honest title and does not impinge on constitutional prohibitions."

That great constitutional lawyer, Chief Justice Cooley, in treating this same question, in his valuable work on Constitutional Limitations, at page 205 (7 Ed.), used this language: "It may therefore be as-

sumed as settled that the purpose of these provisions was:  .  .  .  Second, to prevent surprise or fraud upon the Legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they shall so desire.''   And continuing, on page 212, he says: ''The courts cannot enlarge the scope of the title; they are vested with no dispensing power; the Constitution has made the title the conclusive index to the legislative intent as to what shall have operation; it is no answer to say that the title might have been made more comprehensive, if in fact the Legislature has not seen fit to make it so.   Thus, 'An act concerning promissory notes and bills of exchange,' provided that all promissory notes, bills of exchange, *or other instruments in writing,* for the payment of money, or for the delivery of specific articles, or to convey property, or to perform any other stipulation therein mentioned, should be negotiable, and assignees of the same might sue thereon in their own names.   It was held that this act was void as to all the instruments mentioned  therein except  *promissory notes and bills of exchange;* though it is obvious that it would have been easy to frame a title to the act which would have embraced them all, and which would have been unobjectionable.''

This same question came before this court again in the case of State v. Persinger, 76 Mo. 346, and on page 347, this language is used: ''We are of the opinion that the motion to quash was properly sustained for the reason that the said act was entitled, 'An act to change the penalty for disturbances of the peace.' This title only authorized the passage of an act chang-

ing the penalty for such disturbances of the peace as were then by law declared punishable.    The said Act of 1870, while it changed the punishment for such offenses, went further and undertook to amend the Act of 1868 by so changing it as to make it an offense *for one person to disturb the peace of another person.* While the title of the act embraced but one subject, namely, a change of the penalty for disturbing the peace, the body of the act not only included that subject, but also another, viz., amending the law so as to make that a disturbance of the peace under the Act of 1870, which was not an offense under the Act of 1868. It therefore follows that as the Act of 1870 embraced two subjects, one of which was not expressed in its title, it is violative of the 32d section, article 4, of the Constitution of 1865, and void as to so much thereof as is not expressed in the title."

The Act of 1872, now under consideration, is a verbatim copy of an act passed by the Legislature of Illinois in 1871. At the time of its enactment that state had a similar constitutional provision to ours, and is as follows: "The General Assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and enforce such laws by adequate penalties, to the extent, if necessary for that purpose, of their property and franchises." [Sec. 15, art. II, Constitution of Illinois.] In obedience to that constitutional command, the Legislature of that state passed the act of which the one in question is an exact copy, and the title of that was as follows: "To prevent unjust discriminations and extortions in the rates to be charged by the different railroads in this State, for the transportation of freight on said roads." The question we now have before us came before the Supreme Court of Illinois in the case of the Chicago & Alton Railroad Co. v. People ex rel., 67 Ill. 11, and in passing upon the constitutionality of

that act, that court used this language: "This provision expressly directing the Legislature to pass laws to prevent unjust discrimination is a recognition of the palpable fact that there may be discriminations which are not unjust, and by implication it restrains the power of the Legislature to a prohibition of those which are unjust. That was undoubtedly the object of the Legislature in passing the existing law. This is clearly shown by its title. But the act itself goes further. It forbids any discrimination whatever, under any circumstances, and whether just or unjust, in the charges for transporting the same classes of freight over equal distances, even though moving in opposite directions, and does not permit the companies to show that the discrimination is not unjust. . . . Before this act can be enforced it should be so amended as to correspond with the requirements of the Constitution by directing its prohibitions against *unjust* discriminations."

When we consider that the Supreme Court of Illinois has held the act of which ours is a copy to be unconstitutional, and the fact that said opinion is in harmony with the many decisions of this court, involving similar statutes and constitutional provisions, and fortified and reinforced as they are by Chief Justice Cooley's great work, it seems to me that there is no logical escape from the conclusion that the Act of 1872, in so far as it prohibited all discriminations made by a railroad in the transportation of freight, was unconstitutional and void. These views are supported by the following cases from this court: State ex rel. v. Lafayette County, 41 Mo. 39; State v. Great Western Coffee Co., 171 Mo. 634; Kansas City v. Payne, 71 Mo. 159; State ex rel. v. Baker, 129 Mo. 482; Witzmann v. Railroad, 131 Mo. 612; Shively v. Lankford, 174 Mo. 535; Dart v. Bagley, 110 Mo. 42; In re Hauck, 70 Mich. 396; Callaghan v. Judge of Superior Court, 59 Mich. 610; 26 Am. and Eng. Ency. Law (2 Ed.), pp. 579, 590.

II. In the previous paragraph of this opinion we have assumed that the learned counsel for respondent was correct in his contention that the Act of 1872, from which sections 1126 and 1160 of the Revised Statutes of 1899 are literally copied, was enacted for the purpose of preventing railroad companies from making discriminations in the shipment of freight over their roads. My associate, in his opinion, has adopted that same view of that act; but with all due respect for his ability, learning and judicial experience, I feel constrained to entirely disagree from the conclusions herein reached; and, if I am right in my construction of that act, it is not only unconstitutional upon the grounds stated in paragraph one hereof, but for two other equally valid reasons, which I will now proceed to state.

It should be borne in mind that the Constitution of 1865 was perfectly silent upon the questions involved in this litigation, nor was there any legislation upon those matters until the Act of 1872 was passed. All freight and passenger traffic over railroads prior to that time was governed by the common law, which allowed common carriers to make reasonable and just discriminations in the transportation of freight and passengers. [4 Elliott on Railroads, secs. 1467, 1565 and 1676; 17 Am. and Eng. Ency Law (2 Ed.), p. 135; 2 Hutchinson on Carriers (3 Ed.), secs. 521, 588 and 589; Railroad Commission v. Weld, 96 Tex. 394.]

Now the body of the Act of 1872 did not say a word about just or unjust discrimination in the transportation of freight; nor is there any language contained in the act which prohibits either just or unjust discrimination, but left the shipper and carrier in that regard just where the common law placed them, with the exception as to short or long hauls. Section 1 of the Act of 1872 only prohibited railroad companies from charging more for a short haul than for a long one, along all portions of their lines, and has no refer-

ence directly or remotely to the question of discrimina-
tion. Section 2 defined the meaning of the words "rail-
road corporations," as used in the act. Section 3 was
to prevent the increase of tariff rates above what they
were the year previous. Section 4 prescribes the pen-
alty for the violation of the provisions of the act; and
section 5 is an emergency clause.

The first constitutional provision adopted by this
State upon this question is section 12 of article 12 of
the Constitution of 1875, which reads as follows: "Sec.
12. It shall not be lawful in this State for any rail-
way company to charge for freight or passengers a
greater amount, for the transportation of the same, for
a less distance than the amount charged for any
greater distance; and suitable laws shall be passed by
the General Assembly to enforce this provision; but
excursion and commutation tickets may be issued at
special rates."

Clearly, this provision is fashioned after the Act
of 1872, and was laying one of the two corner stones
upon which the Legislature was commanded to base
a system of laws, which would "correct abuses and
prevent unjust discrimination and extortion in the
rates of freight and passenger tariffs on the different
railroads in this State." But taken by itself, this sec-
tion of the Constitution is not so comprehensive in
its provisions, commands and injunctives as were
those of the Act of 1872. Neither that section nor that
act prohibits discriminations in the transportation of
freight and passengers, but were for the purpose of
preventing railroads from charging more for a short
haul than they charged for a long haul, which applied to
everyone without discrimination, and if it was not for
section 14 of the same article, I suppose it would not
be seriously contended that a railroad company would
not have a perfect legal right, barring the common law
rule, to discriminate in favor of one person against
another, in furnishing cars and in receiving and de-

livering freight; nor from charging one person the same price for carrying freight five hundred miles that it charged another for carrying the same amount and quality a distance of fifty miles, or from charging one person the same price for a short and a long haul, and charging another a higher or lower price for carrying the same quantity and quality of freight the same distance. If there are any such inhibitions couched in either the Act of 1872 or in said section 12 of the Constitution I have been unable to find them. But in order to prevent just such discriminations as above pointed out, section 14 of the same article of the Constitution was adopted, which is as follows:

"Sec. 14. Railways heretofore constructed, or that may hereafter be constructed in this State, are hereby declared public highways, and railroad companies common carriers. The General Assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and shall from time to time pass laws establishing reasonable maximum rates of charges for the transportation of passengers and freight on said railroads, and enforce all such laws by adequate penalties."

When we consider sections 12 and 14 together, which we must do in order to get at the intention of the framers of the Constitution, it is clearly seen that it was their intention to have the Legislature pass such laws as would not only prevent railroad companies from discriminating in furnishing cars, receiving and delivering freight, but also to prevent all unjust and unreasonable discriminations among shippers in the short and long hauls; but neither of said sections, nor both construed together, were intended to prevent just and reasonable discriminations within the limitations of those sections and laws thereafter to be enacted in pursuance thereof. If it had been the

intention of the framers of the Constitution to prevent all discrimination, reasonable and just, as well as unreasonable and unjust, then why did they provide in both of said sections that the Legislature should enact suitable laws to carry into effect these provisions? If the intentions had been to prohibit all discrimination, then why did they not so state in so many words in the Constitution, and at the same time declare such provisions to be self-enforcing? By so doing all the legislation we have upon those subjects and the complications and litigation that have grown out of the same could and would have been avoided. But the fact that the Constitution did not so provide, taken in connection with its command to the Legislature to enact suitable laws to carry into effect those provisions and to prevent unreasonable charges and unjust discrimination and extortion, indicate to my mind that it was never the intention to prevent just and reasonable charges and discriminations within the constitutional and statutory limitations then fixed, or thereafter to be established. And it should also be borne in mind that the constitutional provisions under consideration were adopted, *not because the Legislature did not previously possess ample power to enact such laws as would prevent the abuses therein denounced,* but were intended as a command to the Legislature to enact such laws as would *prevent the abuses therein mentioned* and at the same time place limitations upon the power of the Legislature in fixing rates to be charged and prohibiting it from fixing a rate which would be below what was reasonable and just, and thereby withdraw from the Legislature the power to fix rates which would be confiscatory under the provisions of the State and Federal Constitutions. [McCully v. Railroad, 212 Mo. 1; Railroad v. Smith, 173 U. S. l. c. 687 and 688.]

The Constitution by commanding the Legislature to pass suitable laws to correct the abuses and

extortions therein mentioned, and which had  been practiced by many of the roads in fixing and collecting rates, *no more intended thereby to abolish all discriminations* than it did *to prohibit the collection of  all rates and tolls,* because the very same language of the section which is directed at the one is directed at the other, and both are found in the *same clause and sentence of said section* 14; and what applies to  one must of necessity apply to the other. Had the framers of the Constitution intended to prohibit the collections of all tolls for carrying freight and passengers, then that provision of the State Constitution would have been clearly void under articles 5 and 14 of the amendments of the Constitution of the United States, which provide that private property shall not be taken for public use without just compensation. [Railroad  v. Smith, supra.]   Such a provision would be confiscatory in its nature and violative of the Constitution of the United States. Then by parity of reasoning, if it was not the intention to abolish all tariff rates, then it was not the intention to prohibit all discriminations. Clearly, it was the intention of the framers of  the Constitution to abolish only unreasonable and extortionate rates, and all unjust and unreasonable  discriminations in the transportation of freight and passengers. [Chicago & Alton R. R. v. People ex rel., 67 Ill. 11.]

The Constitution commanded the Legislature to enact such laws as would carry into effect those provisions, and in obedience to that mandate, and within the limitations prescribed, it attempted to enact such legislation as would prevent the collection of extortionate rates and from making unjust and unreasonable discriminations by fixing maximum rates; and in order to carry into effect those rates the Legislature also created the Board of Railroad and Warehouse Commissioners with power to regulate, fix and publish schedules of tolls to be charged for transpor-

tation of freight and passengers, which were to be binding upon the companies until readjusted, or set aside by the judgment of some proper court, and by passing many other statutes prescribing the rights, powers and duties of such railroad companies. [R. S. 1899, secs. 1136-8; McGrew v. Railroad, 114 Mo. 210; Railroad v. Smith, supra; McCully v. Railroad, 212 Mo. l. c. 17 and 18; Winsor Coal Co. v. Railroad, 52 Fed. 716; Cohn v. Railroad, 181 Mo. 30.]

Now, if our interpretation of the Act of 1872 is sound, and if viewed in the light of said constitutional provisions 12 and 14, then we are unable to see how it can be contended that said act either prohibits just or unjust discrimination, or that if that had been the intention of the Legislature, then it would have been invalid under those constitutional provisions, after their adoption. In brevity, I do not believe it was the intention of the Legislature, by the Act of 1872, to prohibit *either just or unjust discrimination* in the transportation of freight over railroads, for the reason that there is *nothing in the body of the act which refers even remotely to that subject;* but conceding, for argument's sake, that such was the intention of the Legislature, then, in my opinion, it was abrogated and annulled by the adoption of the Constitution of 1875. That being true, the act is void, first, because the title of the act refers to one subject, namely, "unjust discriminations," while the body of the act refers to an entirely different subject, to-wit, the short and long haul, which is a clear departure from the title of the bill, and for that reason it is obviously unconstitutional and void, because the subject of the act is not expressed in the title thereof, as commanded by section 32 of article 4 of the Constitution of 1865, and, second, because even if valid when enacted, it was repealed and annulled by the adoption of the Constitution of 1875.

This is not only the plain meaning of the language employed in the Act of 1872, and in the constitutional provisions mentioned, but it is the sound and common sense interpretation that has been placed upon them by the Board of Railroad and Warehouse Commissioners, and by every other State officer who has had anything to do with the administration of the railroad laws, and by every railroad company in the State, from the time of the passage of the act and the adoption of the Constitution of 1875 down to the time of the institution of this suit, with one exception, and that exception is found in the case of McGrew v. Missouri Pacific Ry. Co., 177 Mo. 533, which will be considered in a subsequent paragraph of this opinion. I am, therefore, clearly of the opinion that the Act of 1872 was null and void, and had no force or effect at the time of the institution of this suit because of the three reasons before stated

III. Aside from the foregoing observations regarding the interpretation and invalidity of the Act of 1872 in the light of sections 12 and 14 of the Constitution, those sections themselves demand a most careful consideration at the hands of this court.

This brings us to the consideration of whether there is a conflict, or seeming conflict, between those sections of the Constitution, and if so, what is the duty of this court in the premises?

Section 12 makes it unlawful for a railroad company to charge a greater amount "for a less distance than the amount charged for a greater distance;" and section 14 makes it the duty of the General Assembly "to pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State."

It is to be regretted that the proceedings of the Constitutional Convention of 1875 have never been

printed, so that the bench and bar could see the reasons given by the framers of the Constitution for the adoption of the different provisions thereof. If we had the time and opportunity to investigate the discussion of those matters, such investigation might prove most instructive; but in the absence of sufficient time and opportunity to make such an investigation, we must ascertain from the wording of those sections of the Constitution their true meaning.

On the face of the two sections there appears to be a seeming irreconcilable conflict. If section 12 is literally construed, it might be held to mean that all discriminations, as to the long and short haul, just as well as unjust, under all circumstances and conditions, are intended to be prohibited; in other words, to be a constitutional enactment similar to the Act of 1872. While on the other hand section 14 required the General Assembly to pass laws to correct abuses and prevent unjust discrimination.

If the framers of the Constitution had intended by section 12 to prohibit all species of discrimination, then section 14, requiring the General Assembly to pass laws to prevent unjust discrimination, was not only a work of supererogation, as before suggested, but also created a manifest incongruity in the organic law. For it could not be true that the lawmakers intended by section 12 to prohibit absolutely all discriminations, and yet by section 14 to authorize the General Assembly to pass laws that would simply prevent unjust discrimination. And the framers of that Constitution must have had in mind not only the Act of 1872, but the decision of NAPTON, J., in Sloan -v. Railroad, 61 Mo. 31, holding that it was lawful for a carrier to make just discriminations where the circumstances and conditions were not the same. And likewise to have known that the Supreme Court of Illinois had recently decided that the Illinois statute,  from

which the Act of 1872 was borrowed, was unconstitutional, because it attempted to prohibit just, as well as unjust, discrimination.

But whatever may have been the reason that actuated the members of the Constitutional Convention, the result is that there is an incongruity, an irreconcilable inconsistency, between sections 12 and 14 of article 12 of the Constitution, and there is nothing that can now be done except either to hold that the one cuts the throat of the other, and, therefore, the Constitution itself is a *felo de se* (O'Brien v. Transit Co., 212 Mo. 1. c. 66, and cases cited), and neither obtains, or else have this court to reconcile the two. The two can only be reconciled by holding that prohibitions of section 12 are explained, modified and made consonant with the common law by the provisions of section 14. In other words, that the lawmakers explained in section 14 that by section 12 they only intended to prohibit unjust discrimination, and that what is an unjust discrimination is a question for the Legislature. This is perfectly obvious, for the reason that the very same section of the Constitution provides that the Legislature shall "pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger traffic." Why the latter provision, if section 12 was absolute and self-enforcing, as has been suggested? This idea is strengthened by the fact that section 12 itself also provides that the Legislature shall pass suitable laws to enforce its provisions, thereby showing the intention of the framers of the Constitution to delegate to the Legislature the power to reconcile the apparent conflict that exists between the two sections by enacting statutes which would avoid all extortion and unjust discrimination on the part of railroads, and at the same time protect the interests of the public and the roads themselves by permitting them to make just and reasonable discriminations under the sanction and

approval of the State Board of Railroad and Warehouse Commissioners. This view is supported by the decision of the Supreme Court of Illinois in the case cited of C. & A. Railroad v. People ex rel., 67 Ill. 11, and also by the decision in the case of Interstate Commerce Commission v. L. & N. Railway, 73 Fed. 409, construing the Interstate Commerce Act of 1887, wherein it was held that the transportation of goods involves the necessity of doing justice to three parties—the carrier, the trader and the public, the latter being the most important of all, because without that consideration, the carrier and the trader might be able to create a monopoly in respect to the necessaries of life by excluding competition from shippers at a greater distance from the point of consumption.

We conclude, therefore, that when sections 12 and 14 of the Constitution are construed together, it must necessarily be held that the framers of the Constitution did not intend to create any incongruity in the organic law, or intend to prohibit all discriminations in one breath, and only to prohibit unjust discriminations in the next, but that the intelligent lawyers and judges that composed the Constitutional Convention of 1875 knew the prior state of the law, and intended only to legislate against, or provide against, unjust discrimination. Unless this be true, then we must convict those able gentlemen of a most lamentable mistake, and unless this be true, then sections 12 and 14 destroy and nullify each other.

But it has been suggested that in this case the judgment below can be sustained whether the Act of 1872 was repealed by the Act of 1887, or was substituted by the Act of 1887, or not, because section 12 of article 12 of the Constitution is self-enforcing, and any appropriate common law remedy can be invoked to enforce it, and no legislative aid is necessary. This view cannot be maintained, and at the same time give any possible effect to section 14 of article 12 of the

Constitution and to the Act of 1887 passed pursuant thereto. It cannot be true that the framers of the Constitution intended section 12 to be self-enforcing, and at the same time intended to make it the duty of the General Assembly to pass laws preventing unjust discriminations. The Governor of the State and the General Assembly of the State have obeyed the mandates of section 14 and have passed an act (1887) which carries out that requirement of the Constitution. Now it would be a solecism to say that the framers of the Constitution had enacted a law which would be self-enforcing, and which would prohibit all discriminations of every kind, under all circumstances and conditions, and at the same time to say that those learned lawmakers had also devolved a duty on the General Assembly to enact laws that would simply prevent unjust discrimination. It is likewise a solecism to say that one is absolutely prohibited from doing an act, and at the same time to say that he may do the act under certain circumstances and conditions.

The questions here presented for consideration and determination are not foreclosed by the decision of the Supreme Court of the United States in Louisville & Nashville R. R. Co. v. Kentucky, 183 U. S. 503. These questions and these complications and contradictions between the acts of 1872 and 1887, and the provisions of section 12 and 14 of article 12 of the Constitution, were not present in that case. The Fourteenth Amendment to the Constitution of the United States guarantees to every person due process of law, and no case can be found decided by the Supreme Court of the United States, and certainly not the case of Louisville & Nashville R. R. Co. v. Kentucky, 183 U. S. 503, that holds that a person can be convicted of a crime for doing an act such as is prohibited by the Act of 1872 and by section 12 of article 12 of the Constitution, and at the same time not be guilty under the provisions of the Act of 1887 and under section 14 of

article 12 of the Constitution. It cannot be true that any court could hold that a person could be guilty and not guilty at the same time, guilty under the Act of 1872 and under section 12 aforesaid, and not guilty under the Act of 1887 and under section 14 of article 12 aforesaid. Yet this is the condition presented in this case, and there is no solution for it that will stand the test of common sense, reason, logic or precedent, or that will be sanctioned, in my judgment, by the Supreme Court of the United States, if this case is taken into that court, as it probably will be, if the decision is adverse to the appellant herein, unless this court holds that the Act of 1872 was repealed necessarily by the Act of 1887, and further holds that what seems to be an absolute prohibition against all manner of discrimination under section 12 of article 12 of the Constitution is modified and explained by the provisions of section 14 of article 12 aforesaid; in other words, that only unjust discriminations are forbidden under the Constitution and laws of this State.

IV.  Having decided in paragraphs one and two of this opinion that the Act of 1872 is unconstitutional and void, and also by the latter that said sections 12 and 14 of the Constitution are not self-enforcing, we will now determine whether or not there are any valid laws in force which give efficiency to those sections.

Respondent bases his right of recovery upon sections 1126 and 1160 of Revised Statutes of 1899, and contends that they put in operation those sections of the Constitution, and that they are in full force and effect; while upon the other hand appellant retorts by saying that said sections, which are sections 1 and 4 of the Act of 1872, brought forward and copied without change in the various revisions of the statutes from the time of their passage down to and including the Revised Statutes of 1899, and are there numbered as sections 1126 and 1160, are unconstitutional and void;

and that the mere fact that they have been brought forward and copied into the various revisions did not breathe into them new life and validity.

If we correctly understand learned counsel for respondent, he does not seriously contend that the Act of 1872 when enacted was constitutional and valid, but contends that sections one and four thereof, which are sections 1126 and 1160 of the Revised Statutes of 1899, were re-enacted by an Act of 1879 revising and amending chapters 63, 64, 65 and 66 of the General Statutes of 1865, and by incorporating therein the entire Act of 1872 and passing the whole as an amended and revised bill.

The opinion of VALLIANT, P. J., sustains this contention of respondent by holding that "the General Assembly of 1879 passed an act entitled 'An Act to revise and amend chapters 63, 64, 65 and 66 of the General Statutes of Missouri concerning corporations,' approved May 31, 1879, in which the sections we are now considering were included. Chapter 63 of the General Statutes of 1865 was one of the chapters so revised and amended and was entitled, 'Of Railroad Companies.' This section was germane to the subject of the chapter and was an amendment to it. The section does not rest therefore on the mere act of the legislative committee carrying it forward as in the case cited. [Brannock v. Railroad, 200 Mo. l. c. 568.]"

I have two criticisms to suggest regarding that clause of the opinion of my learned associate. First, that while section 1 of the Act of 1872 was properly re-enacted in 1879 and is now section 1126 Revised Statutes 1899, and upon which this suit is based, it was repealed by an Act of 1887. Second, that said sections 12 and 14 of the Constitution are not self-enforcing, and there is no statute or common law in force which prohibits reasonable and just discrimination by railroad companies in the transportation of freight and passengers over their roads under the direction and ap-

proval of the Board of Railroad and Warehouse Commissioners; but upon the other hand, the Act of 1887 expressly authorizes them to do so.

I will discuss these propositions in the order stated, but before doing so I wish to state in the first place that I am at a perfect loss to understand the motive which induced the plaintiff to institute and prosecute this suit, for the reason, as shown by the freight schedules, made and promulgated by the State Board of Railroad and Warehouse Commissioners (which are public records and of which we have the right to take judicial notice), the rates with which he was charged were, in every instance, so far as I have been able to ascertain, less than the legal rates, and were evidently made for the purpose, among others, of enabling him to sell his coal in competition with the coal of mines located on other roads and in other states. If the reduced rates of which he complains had not been made by defendant he would not have been able to have marketed his coal, mentioned in this suit, in competition with coal from other mines, and would therefore have lost that trade, as will be presently shown. The defendant was also benefited by said reduced rates or it would not have made them, for the reason that it was thereby enabled to secure the transportation of said coal which it otherwise would not have been able to have done on account of the competition of other mines located on other and shorter roads. Clearly, this was the case at Boonville, where coal was going there from Lowery City and Brownington over other roads; at Sweet Springs, where coal was going from Higginsvillle; and Joplin, where coal was going from various mines located in the State of Kansas. If the defendant company had not made the reduced rates complained of it would have meant that the mines located on other roads and in different states would have monopolized the coal business at the points to which the reduced rates were made, and that

of course would have worked injury on those communities as well as upon the plaintiff by limiting his mine output, and upon the defendant by depriving it of the transportation of the coal, about which this suit was brought.

Clearly, the plaintiff was not damaged by those reduced rates; but, upon the contrary, by enabling him to sell at the places named, the output of his mines was greatly increased, and the cost per ton for mining was doubtless reduced, and consequently he was thereby enabled to get a higher price for his coal than he could have received had his output been curtailed to the extent of the quantity sold at said competitive points.

Since the defendant had to run its trains any way, and as it could not, as before shown, secure the transportation of this coal unless it reduced the rates to those competitive points, it was benefited by the business so long as the rates which it received were more than the expense of the transportation.

This record shows that these reduced rates enabled the plaintiff to do business at those competitive points against mines located on other roads and in other states, and if like reductions are to be made to all other, or non-competing points, the defendant could not afford to make the reductions to plaintiff and others to the competitive points, for the reason that the loss incident to the general reduction would be much greater than the gain the defendant would derive from the plaintiff at the competitive points on account of the reduced rates. By consulting the geography of the State and the freight rates established by the State Board of Railroad and Warehouse Commissioners, it will appear that the towns to which the reduced rates were made for the benefit of the plaintiff would get their coal from other mines over other roads at a less cost; and no other point or person located on the Missouri Pacific could justly claim that he or it was injured by the company giving the plain-

tiff the reduced rates mentioned, for the reason that those competitive towns would have the same rates from other roads whether the defendant made them or not; consequently no coal mine or other industry was or could be injured by the reduced rates made by the defendant to said competitive points.

But on the other hand, by the reduction of coal rates to the points mentioned, the Myrick coal mines were benefited, and the plaintiff was thereby enabled to keep more men employed at his mines, and his output was greatly increased, and consequently his cost per ton was materially reduced and he was thereby better enabled to sell coal at a profit than he otherwise would have been. So was the consumer or industry at the competitive points benefited by reason of the competition caused by plaintiff's coal; and the defendant was also benefited by getting the transportation of all coal shipped by plaintiff to those points. All of these are State institutions, which should be encouraged and supported by all legitimate means.

By again consulting the geography of the country, it will clearly appear that the Joplin coal rates complained of were made in competition with the coal and coal rates from the Cherokee and Pittsburg District of Kansas; and if our statute which provides that no less charge shall be made for a longer than a shorter haul were to prevail, as contended for by counsel for plaintiff, it would mean in many cases that the industries in other states and foreign transportation companies would thrive and wax fat at the expense of Missouri industries and carriers.

The close proximity of the Cherokee and Pittsburg coal district of Kansas to Joplin and neighboring Missouri towns is such that the Missouri coal mines could not market their products in any such town if it were not for said reduced rates, or if the long and short haul clause of the statute, as understood by some of my associates, was enforced. So long as no

one in Missouri is injured, our industries should certainly be enabled to do business even in all competitive towns and cities of this State as against outsiders, which clearly they could not do if the construction placed upon our statutes by counsel for plaintiff is correct.

We know from the common knowledge that the cost of mining coal in this State far exceeds the cost of mining it in the State of Illinois, and if Missouri coal mines are not given reduced rates to Boonville and other competing points, Illinois coal will surely supply their needs. This great difference in the price of mining coal in Illinois as compared with mining it in Missouri enables the former with much higher railroad rates to sell its products in this State even against the legal freight rates made from the Missouri mines. The Missouri mines, therefore, in order to be enabled to do any business in many towns of this State competing with the Illinois coal, it is necessary for the railroads to make them a lower rate than the legal rate; for instance, by an examination of the state and interstate rates it appears that the rate from the Illinois coal fields to Boonville is $1.95 per ton and to Marshall $2.10 per ton. Still this record shows that defendant has made a rate of forty cents per ton on coal from Myrick to Boonville, presumably in order to enable it to haul some of the coal that is consumed at the latter place. Otherwise, the Illinois mines would supply that city's entire demand.

Of course, it goes without argument that the defendant, like other railroad companies, is desirous of getting as high freight rates as it possibly can. Self-interest prompts it to do so, and when a railroad, therefore, voluntarily reduces the rates prescribed for it by statute or by the railroad commissioners, it must mean that it cannot otherwise procure the freight for transportation. Railroad companies understand the commercial conditions governing the situation and that

those conditions will not admit of transportation by them unless at reduced rates. Besides that, they understand that the communities they serve will be deprived of the advantages which flow from the successful operations of their industries. By making special or such reduced rates to meet those commercial conditions, the competition of other markets and of like or other commodities, they are conferring substantial benefits on those communities. If such reduced rates are not made, in all probability the business will not be forthcoming. Under such circumstances, it seems to me that carriers are justified in making such rates as will enable those communities to do business in competitive markets, provided there is no loss to them in the transaction; and it can be readily understood that if such reduced rates do not affect or influence the rates on other existing traffic, they can sometimes and under certain conditions be made very low before a loss will result therefrom.

Where a railroad plant and all facilities are already ample and sufficient to enable it to transport such freight without further expenditures, then it will be seen that the expense incurred in this particular transportation would not be in proportion to that of its regularly established business. The difference in the rail carriers' rates can sometimes be very great and it cannot be justly said that some are unreasonably high, or that others are unreasonably low, for the reason that the expense which a traffic under certain conditions adds to the already existing expense may be covered by very low rates without injury to any community or locality, and yet the rates which it may be necessary to charge upon other traffic must of necessity be higher so that the entire cost may be covered and the property be safely and successfully operated.

It is a common complaint made by the ordinary uninformed man, that the reduced competitive rates on the through rates which may be lower for a longer

than for a shorter haul produce a loss to the railroads which they have to recoup or make back by charging higher rates for shorter hauls; that is to say, that they do the business in such cases for less than they can afford to do it for were they not able to make an unreasonably high profit from their local business. That is an erroneous idea. If the railroads did not take the competitive business at the low rates, it would mean they would not procure any of that business, and consequently they would lose just so much revenue as would be derived from its transportation had they procured it. For instance, suppose a competitive through business was offered at ten cents a hundred and that the same carrier was charging twenty cents a hundred for the short haul or intermediate points. Under such conditions it must take the through competitive business at ten cents or not take it all, for the reason that other roads which have shorter routes would take the business for the ten cents, which would be their legal local rate. The intermediate stations do not complain of the reasonableness of their rates, because the longer competing line does not take the through freight, yet they do not see that by doing so it would enable it to carry local shipments at a lower rate. By taking the business at the ten-cent rate there may not be as much profit to the longer road as there would be if it charged and could receive the local higher rates, but by reason of the fact that there is some profit in the business at the ten-cent or competitive rate, it can be justly said that such business adds to the receipts of the company more than to its expenses, and for that reason it is justified in engaging in said through business, provided by so doing it does not injure or affect the intermediate shipper or his business upon which the higher rates are charged. By reason of there being some profit in the business, if profit it may be called, it makes the cost of the entire business of the company less

per unit and it is thereby better able to give lower rates to the intermediate points than it otherwise would be.

I gather from the reports of the Interstate Commerce Commission that approximately the following divisions may be made of the entire expense of maintaining and operating the railroads of the United States. One-third to pay interest on stocks and bonds; another third to be expended in maintaining stations and station grounds, salaries of the general officers, legal officers, division officers, station agents, clerks, telegraph operators, bridge men, section men, and all that class which it is necessary to retain whether the competitive through business is taken or not. In these, two-thirds of the expense which might be called a fixed expense goes on whether the railroad hauls ten million or thirty million tons of freight. The remaining third of the expense might be termed the movement expense, which consists of the wages of engineers, firemen, conductors and brakemen, locomotive and car repairers, fuel, oil, waste, water, the wear and tear of rails, decay of ties, etc. As the competitive through traffic is offered at certain specified rates made by influences beyond the control of the carrier to change or affect, the question to be first determined is—will it pay this so-called movement expense? The other two-thirds of the expense of course goes on whether the through traffic is taken or not. Any sum received in excess of this movement expense is just so much more than can be applied toward meeting the fixed two-thirds expense, and the road is thereby enabled to make the burden lighter for the local or non-competitive traffic. The actual expense therefore attendant upon the transportation of competitive traffic which the railroad can secure only on condition that it charges certain specified rates made for it by outside influences entirely beyond its power to control, change or affect is the actual outlay which its movement necessitates.

It is thus seen that if the railroad plant and other

facilities are ample to enable it to transport such traffic without further outlays, the expense incurred will not be in proportion to that of its regularly established business, nor will the movement of competitive freight always incur the entire expense included in the several items before mentioned comprising the movement expense.

The movement expense of such traffic might be decreased materially according to the different conditions or exigencies that might arise. For instance, if the traffic was offered at a time when empty cars had to be returned, which at certain seasons of the year amount to thousands, the item of wages, fuel and other supplies, together with repairs of locomotives and cars, would not properly enter into the cost. The expense incident to these would be largely incurred with the movement of empty cars as well as with the loaded ones. Again, if the preponderance of tonnage was in the direction opposite to that which the competitive business was destined and such business enabled the carrier to load trains that would otherwise be hauled light or empty, the expense of the new competitive business would be inappreciable. Nor would this competitive business entail a proportionate share of the large expense of maintaining the track, bridges and culverts, which constitute a large part of this third of the movement expense. The wear and tear of these are not in direct ratio to the tonnage transported. The wear and deterioration caused by the action of the weather, the repairs, renewals and washings of embankments, of the masonry, ballast and road crossings, the decay of ties, the bridges and fences would go on just the same whether this competitive business was or was not hauled, so that it would not be proper to charge such extra business with a tonnage proportionate to the expense of their maintenance.

Bearing in mind those many influences, it will be observed that many of the items comprising the move-

ment expense already incurred by the then existing business would not be changed by the addition of the new competitive traffic, and that the entire expense of its carriage would in many cases be inappreciable.

From what has been said it will be seen that the difference in the rates of railroads can sometimes be very great, and yet it cannot be justly said of them that some are unreasonably high or others unreasonably low; that the expense which a traffic under certain conditions adds to the already existing expenses of a railroad may be covered by very low rates without injury to any community or locality, and yet the rates which it may be necessary to charge upon other traffic of necessity be higher in order that the entire cost may be covered and the property be safely and, successfully operated. Any profit, therefore, which may be in the transportation of competitive traffic— and from what has been said as to the expense, we think it would be conceded that the rates would have to be exceedingly low before there was no profit—relieves the local traffic from so much of the burden of meeting the fixed steady expense, and so long as the receipts from this competitive traffic are in excess of the expenses incurred for its transportation, there can be no such thing as recouping loss on low rate competitive business by charging higher rates on lo-. cal traffic, no matter how large a difference there may be between the two rates.

We might cite a case in point, which might arise, wherein a carrier by the reduction of rates enables an industry on its line to carry on its business by meeting the new commercial conditions that may spring up from time to time. For instance, the piping of gas and oil from the Kansas and Oklahoma fields to Kansas City and St. Joseph threatened to displace in those cities the sale of Missouri-mined coal, especially that mined at remote points from those cities. To relieve the situation the railroads came to the aid

of the coal mines and reduced the rates in some cases to nearly one-half the figures of the legal maximum rates, and thus enabled these mines to continue their business in those cities, which otherwise could not have sold a pound of coal in either of those markets. Nor could any intermediate station claim it was unjustly discriminated against by this act of the railroads; and if the railroads were obliged to make similar rates for corresponding distances on other portions of their lines, then, of course, it would mean that these reduced rates would have to be withdrawn, because the small profit derived from such reduced rates to those cities would be more than offset by the loss they would sustain by the reduced rates at the other places. In such case the coal mining industries of Missouri would be hurt—the railroad industry in so far as the coal traffic from those mines is concerned would be killed—the Kansas City and St. Joseph industries and other consumers would be crippled, but the Kansas and Oklahoma industries would be benefited by having a monopoly of the fuel business in those cities, and would command thereby higher prices from the consumer than they could otherwise get.

By consulting the Missouri Pacific time-tables and the Interstate Commerce reports, it will be seen that the defendant operates about sixteen hundred miles of railroad in the United States, and that about one-half of that mileage runs at right angles to its main lines. Commercially, the city of St. Louis chiefly serves the towns embraced within one-half of defendant's entire mileage. The same time-table and reports show that the distance from St. Louis to the principal towns on the lines *via* the Missouri Pacific is longer than that of any other road which runs from that city direct to them. If, therefore, the defendant desires to engage in the traffic of such towns, it will be obliged to make the same or lower rates to them as are made by the shorter-distance lines; but if it must

observe the long and short-haul principle of the statute at places not reached by the shorter lines, it may find that the loss from a reduction of rates to the noncompetitive points would be greater than the gain it hoped to derive from the business of the towns reached by the shorter lines—in which case it could not afford to engage in the business as against the shorter lines' rates. A case in exact point may be suggested. The distance from St. Louis to Springfield *via* the Frisco road is two hundred and thirty-nine miles, and *via* the Missouri Pacific it is four hundred and ninety-seven miles. In order to engage in the Springfield business, the defendant would be obliged to make rates not to exceed those charged by the Frisco for two hundred and thirty-nine miles; but more than this, if the long and short-haul principle, as announced by counsel for plaintiff, were to be enforced, it would have to reduce the rates back two hundred and fifty-eight miles, or until it came to a station on its line which is two hundred and thirty-nine miles distant from St. Louis. The question would then be presented as to whether it could not better afford to give up the Springfield business wholly to the Frisco rather than reduce its rates over a two hundred and fifty-eight mile stretch of country. It must be readily seen that no one would be benefited by the latter course; St. Louis and Springfield would practically have but one road to serve them instead of two, and the defendant would sustain the loss of the share of the business it might otherwise control to the city of Springfield. That is but one of the many like cases which would be produced in this State if the long and short-haul rule is to be observed, namely, the same situation would be produced at Joplin, Carthage, Aurora, Lamar, Nevada, Charleston, Delta and many other places too numerous to mention, if we should go to other roads. On the other hand, no one is or can be injured by the longer line being al-

lowed to engage in the business at such competitive points reached by the shorter line. The intermediate stations are not unjustly discriminated against or injured, for the reason that the lower rate would be effective by the shorter line to all junction ·stations whether the longer line chose to charge them or not.

The courts and Interstate Commerce Commission have rendered many decisions, which will be presently noted, on similar questions to this, and have invariably held that the discrimination must be unjust before the railroad is prohibited from making the lower rate for the longer haul.

Counsel for defendant in arguing this cause stated that if the long and short haul of the statute as understood by counsel for plaintiff was observed, the annual loss of about $600,000 would be entailed upon his client.

While that statement is no part of the record, yet we may use it for the purpose of illustrating the question in hand, and the great loss that would be visited upon defendant if that rule is to be enforced; and if capitalized at four per cent it would be equivalent to wiping out of existence about $15,000,000 worth of defendant's property, and that too with no corresponding benefit to any one, but a positive injury to the competitive towns, as before shown. And that is not all, the same proportionate loss would be entailed upon all other railroads in this State.

The necessity of charging higher rates per mile over some divisions of a railroad than over others is recognized by the State Railroad and Warehouse Commissioners. In promulgating its schedule of maximum freight rates, effective March 1st, 1904, the commission authorized the railroads of this State to charge higher rates per mile between St. Louis and Kansas City on all roads located south of the Missouri Pacific's main line than on those roads situate north thereof. Any one can readily understand that it costs more to construct and operate a railroad in some dis-

tricts of the State than in others, and it is but just that they should be compensated by charging higher rates in those districts.

The foregoing observations have been made for the purpose of showing that there is nothing connected with the construction and operation of a railroad which is inconsistent with the idea that just and reasonable discrimination may be made by a railroad company in the transportation of freight and passengers without doing injustice to or inflicting injury upon any shipper or community in the State, and for the purpose of showing what great loss would be entailed upon the railroads of the State and the public at large if such discrimination is not permitted. It should be borne in mind that the framers of the Constitution, as well as the Legislature which enacted the statute in question, were perfectly familiar with the then existing condition of things before mentioned, when the former framed the organic law of the State, and when the latter enacted said statute, and certainly they must have acted with that condition of things in mind; and to charge either of those august bodies with a design to prevent all discrimination, just as well as unjust, under the circumstances, would do it an injustice and reflect upon its honesty and intelligence.

Returning from this divergence to the two propositions previously stated. Standing alone the Act of 1872 and section 12 of article 12 of the Constitution prohibit all kinds of discrimination as to long and short hauls, just as well as unjust, and therefore change the common law in this respect.

The Act of 1887, as shown by its title, as well as its words and context, and section 14 of article 12 of the Constitution, are aimed only at unjust discriminations, and recognize that it is reasonable, proper and lawful to charge a different or greater compensation where the short haul differs in circumstances and conditions from the long haul, and also where the short

haul is not in the same direction, on the same line with the long haul. It is manifest, therefore, that two incompatible, inconsistent and antagonistic provisions of law are to be found in the Act of 1872 and section 12 aforesaid on the one side, and in the Act of 1887 and in section 14 of the Constitution aforesaid on the other side. Can these conflicting statutes and provisions of the Constitution be harmonized, and if not which must prevail?

As to the statutes it is an invariable rule of law that if there is a conflict, the later one must prevail, for that is the last expression of legislative will. As to the Constitution a different question arises, for both provisions were adopted at the same time, and therefore both must be construed together, and all seeming conflict must be reconciled by construction. Otherwise, in cases of irreconcilable conflict, both would have to fail.

The framers of the Constitution of 1875 must be presumed to have known of the existence of the Act of 1872. Those learned gentlemen undertook for the first time to have the organic law treat of this subject, and they expressed their will in sections 12 and 14 of article 12 of the Constitution. From 1872 and from 1875 the lawmakers were silent in respect to this matter. In 1877 the Governor of this State called the attention of the General Assembly to these questions. The regular session did not act, and thereupon the Governor called a special session of the Legislature for the express purpose of legislating as to these questions, and that special session passed the Act of 1887. It was intended to be and purported to be a complete code of regulations pertaining to these questions. It was passed under a general law entitled, "An Act to Regulate Railroad Companies." It did not amend the Act of 1872, or refer to it in any way. Great stress is laid upon section 21 of the Act of 1887, wherein it is said: "This Act is not intended to repeal any law

now in force, unless in direct conflict therewith, but is intended to be supplemental to such laws.''

But it will be observed that such language was wholly unnecessary and of no force, for if the Act of 1872 is in conflict with the Act of 1887, the Act of 1872 would be repealed by necessary implication, and the court would so hold whether the Legislature said so or not, and it was not within the power of the Legislature to make the Act of 1887 simply supplemental to the Act of 1872 if the Act of 1872 was in conflict with the Act of 1887. Those are questions of law to be decided by the courts and not by virtue of any expression of intention of the Legislature, for it is not a question of intention, but a question of conflict, and therefore a question of law.

So that the legislative declaration in section 21, instead of having any controlling effect upon the decision of these questions, shows on its face that the lawmakers themselves intended the Act of 1887 to be the law of Missouri, and that the law of 1872 should be considered repealed wherever it conflicted with the Act of 1887. At any rate the courts must decide what effect the Act of 1887 had on the Act of 1872.

The Act of 1887 necessarily repeals the Act of 1872, because the Act of 1872 prohibits just, as well as unjust, discriminations, and by section 1160, Revised Statutes 1899, punishes a violation of the act with a fine of one thousand dollars. On the other hand, the Act of 1887 simply prohibits unjust discrimination, and the charging of a larger sum for a short haul than is charged for a long haul, but qualifies that by limiting it to cases arising ''under similar circumstances and conditions'' and ''over the same line in the same direction.'' Section 12 of the Act of 1887 punishes a violation of that act by a fine of five thousand dollars. In addition to all of which, a fine provided under the Act of 1872 goes to the person aggrieved, whereas under section 14 of the Act of 1887 the five

thousand dollar fine goes to the school funds of the county where sued for. Moreover, under the Act of 1872 the person aggrieved is authorized to maintain the action, whereas under the Act of 1887 the action must be maintained in the name of the State of Missouri at the relation of the Board of Railroad Commissioners to the use of the school funds. And the person aggrieved is only entitled under section 10 of the Act of 1887 to recover three times the amount of the actual damages sustained by him, with a reasonable attorney's fee.

The result of all of which is that it is impossible to reconcile the Act of 1872 and the Act of 1887, both as to substance and as to procedure. For it cannot be true that it is an offense against the laws under the Act of 1872 to discriminate in any respect under any circumstances, and at the same time be true that under the Act of 1887 there may be a discrimination where the circumstances are not similar, where the conditions are different, or where the long and short haul are not in the same direction. And likewise it cannot be true that a railroad company can be fined one thousand dollars under the Act of 1872 to be paid to the party aggrieved for making any kind of a discrimination under any circumstances whatever, and at the same time not be guilty of any offense under the law of 1887, because the circumstances and conditions were different and the hauls were not in the same direction. It cannot be true that there can be two laws on the same subject, one of which makes an act a crime under all circumstances and conditions, and punishes it with one fine, and the other makes only certain qualified acts criminal and punishes them with a different fine, to go to a different purpose, and recognizes that other acts may lawfully be done.

In other words, it cannot be true that the Act of 1872, which prohibits all discriminations, just as well as unjust, under all circumstances and conditions, can

be reconciled with the Act of 1887, which does not prohibit all discriminations, but only unjust discriminations, and then only when the circumstances and conditions were the same and when the haul was in the same direction. Or otherwise stated, it cannot be true that a person can be guilty under one act and innocent under the other. Yet such is the result unless the Act of 1872 is repealed by the Act of 1887.

It is thus seen that the Act of 1887 covers the entire field of discrimination in the transportation of freight and passengers by railroad companies, the tolls and compensation to be charged therefor, and prohibiting a greater charge for a shorter haul than for a longer one, under the same conditions; and not only prescribes the penalties to be imposed for the violation of the act but the manner of collecting all damages done to persons in consequence of such violation is prescribed also. Under this state of things this court has repeatedly and properly held that "a statute is impliedly repealed by a subsequent one revising the *whole subject-matter* of the first, and intending to substitute the latter for the former." [State ex rel. v. Patterson, 229 Mo. 364; State v. Hickman, 84 Mo. l. c. 79; State v. Roller, 77 Mo. l. c. 129; Smith v. State, 14 Mo. 152; State v. Summers, 142 Mo. 586, l. c. 595; Yall v. Gillham, 187 Mo. 393; Meriwether v. Love, 167 Mo. l. c. 521.]

By closer analysis of the Act of 1887, which consists of twenty six sections, it will be more clearly seen that the subject of said section 1126 was not only fully covered thereby, but all other phases of discrimination were legislated upon, and the most drastic penalties imposed. Section 4 of the Act of 1887 clearly refers to the short and long hauls mentioned in said section 1126, and under the above rule of construction it must be held that the former by implication repealed the latter. Said section 4 of the Act of 1887 (Laws 1887, Ex. Sess., p. 17), is as follows: "It shall be unlawful

for any such common carrier to charge or receive any greater compensation in the aggregate for the transportation of like kinds of property under similar circumstances and conditions for a shorter than a longer distance over the same line in the same direction; provided, however, that nothing contained in this section shall apply to the carriage, storage or handling of property, either free or at reduced rates, for the United States, for the State of Missouri, or for any fair, exposition, religious, scientific, benevolent or charitable purposes.'' These two sections are directly in conflict with each other. Section 1126 prohibits a railroad company absolutely, and without an exception or qualification, from charging more for a shorter than a longer haul on any part of its line in any direction, while section 4 of the Act of 1887 is not so sweeping and general in its provisions, but only makes it unlawful for railroad companies to charge a greater compensation for the transportation of property of like kinds under *similar circumstances and conditions* for a shorter than for a longer distance, *over the same line in the same direction.* I have italicized the provisions of the latter section which principally differentiate the two sections. Under section 1126 it would have been unlawful to charge a greater toll for the transportation of property of like kinds under *dissimilar circumstances and conditions* for a shorter than for a longer distance over the same line *in the opposite direction,* but clearly the language of section 4 would permit such greater charge, provided the conditions are *dissimilar* and the shipments are made in the *opposite* direction. It is thus seen that the Act of 1887 not only revises the entire Act of 1872 and the various sections of the various revisions, which are copies thereof, but it is also in direct conflict with and repugnant thereto.

As before stated, this court has repeatedly held that a later statute will repeal by implication a prior one, where the repugnancy between them is such that

they cannot stand together or be consistently reconciled. [Glasgow v. Lindell, 50 Mo. 60; Pacific R. R. Co. v. Cass County, 53 Mo. 17; State ex rel. v. Dolan, 93 Mo. 467.]

If section 1126 is still the law of this State, railroad companies cannot lawfully do the things which section 4 of the Act of 1887, which is the same as section 1134 of Revised Statutes of 1899, expressly authorizes them to do, to-wit, to charge a greater toll for shorter hauls than for longer ones, when the conditions are *dissimilar* and the shipments are made in *opposite* directions; but if the rule announced in the cases last cited is sound, then section 1126 and not 1134 is repealed by necessary implication. And this conclusion is in harmony with another line of decisions of this court which hold the last expression of the Legislature upon a given subject should prevail in case of a conflict between it and a previous statute. [State ex rel. v. Heidorn, 74 Mo. 410.]

Again, if it was not the intention of the Legislature to repeal the Act of 1872 (sec. 1126, R. S. 1899), which prohibited the charging of more for a shorter than a longer haul in *any* direction, why did it provide against the charging of more for a shorter than a longer haul when the shorter haul was embraced in the longer one? Section 1126 by its terms prohibited the charging of more for a shorter than a longer haul in all directions, and therefore prohibited the charging of more for a shorter than for a longer haul when a shorter haul was embraced in the longer haul. Section 1134 was superfluous if section 1126 remained in force.

The principle that when the mind of the Legislature is directed to a particular subject, its enactment must be presumed to be exhaustive of the legislative intent with respect thereto, should obtain. Any other conclusion would convict the Legislature of passing a vain and foolish act.

The second reason why I cannot concur with the

opinion of my learned associate is that sections 12 and 14 of article 12 of the Constitution are not self-enforcing, but expressly provide that the Legislature should enact suitable laws for the purpose of carrying into effect those provisions. To hold otherwise would be equivalent to expunging that mandate from those sections. Under that constitutional mandate, there has been but one act passed by the Legislature to give force and effect to those constitutional provisions which is now upon the statute books, and that is the Act of 1887, one section of which is the same as section 1134 of Revised Statutes of 1899. This section, as before stated, does not prohibit railroad companies from charging more for a shorter than for a longer haul, where the conditions are *dissimilar,* and the shipments are made in different directions.

This same question has many times been before the Interstate Commerce Commission, our Railroad and Warehouse Commissioners, as well as before various Federal courts. The former and the latter have invariably placed the same construction upon the long and short-haul clause of the Act of Congress covering the same question, as will appear from the following citations, that the Railroad and Warehouse Commissioners of this State have uniformly placed upon the statute under consideration.

The possibility that a discrimination may be just is recognized by section 2 of the Act of Congress, in declaring what shall be deemed unjust. [Interstate Commerce Commission v. Railroad, 145 U. S. 263.]

It was not the purpose of the Act to prohibit just discrimination in the transportation of persons or property. [United States v. Railroad, 127 Fed. 785.]

The object of section 2 of the act is to prevent one shipper from getting advantage over another in the matter of rates, only where both make a substantially like offering to the carrier. [United States v. Hanley, 71 Fed. 672.]

When traffic is not of like kind, or when the service is not like and contemporaneous, or when the transportation is not rendered under substantially similar circumstances and conditions, difference in charges does not constitute unjust discrimination within the meaning of section 2 of the act. [Interstate Commerce Commission v. Railroad, 43 Fed. 37, 47.]

The language of the act recognizes that a uniform rate between different shippers is not always possible or proper; that the time of service, the kind of traffic, and the circumstances and conditions under which it is transported, may materially change the just obligations and duties of the carrier to its patrons. [United States v. Hanley, 71 Fed. 672.]

A carrier subject to the act is only bound to give the same terms to all persons alike under the same conditions and circumstances. Any fact which produces an inequality of condition and a change of circumstances justifies an inequality of charge. [Interstate Commerce Commission v. Railroad, 141 Fed. 1003, 1014.]

In fixing rates for differing but analogous services, the carrier has the right to exercise an honest discretion. Trifling differences of cost or character of the services rendered do not justify disparity of charges; but where the differences are substantial, either in the work to be performed, or in the utility and value to the persons served, a fair relation of rates meets the carrier's obligation. [Carr v. Railroad, 9 I. C. C. R. 1, 11.]

Discrimination to be unlawful must be unjust. All discriminations between persons are not unlawful under section 2 of the act, but only such as are "unjust." [Interstate Commerce Commission v. Railroad, 43 Fed. 37, 47.] It is not all discriminations that fall within the inhibition of the act, but only such as are unjust or unreasonable. [Interstate Commerce Commission v. Railroad, 145 U. S. 263, 276.]

What constitutes unjust discrimination? In order to constitute unjust discrimination under section 2 of the act, the carrier must charge or receive directly from one person a greater or less compensation than from another, or must accomplish the same thing indirectly by means of a special rate, rebate or other device; but in either case it must be for a "like and contemporaneous service in the transportation of a like kind of traffic, under substantially similar circumstances and conditions." [Interstate Commerce Commission v. Railroad, 145 U. S. 263, 281.]

What matters may or may not be considered in determining the question of discrimination? The provision that discrimination must not be unjust necessarily implies that strict uniformity is not to be enforced; but that all circumstances and conditions which reasonable men would regard as affecting the welfare of the carrying companies, and of the producers, shippers and consumers, should be considered by the commission in enforcing the provisions of the act. [Tex. & P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 197, 219.]

Discrimination must consist in the doing for or allowing to one party or place what is denied to another; it cannot be predicated of action which in itself is impartial. [Crews v. Railroad, 1 I. C. C. R. 401, 1 I. C. C. R. 703.]

When through rates for a longer distance are controlled by competition between carriers, the reasonableness of local rates not so affected is not to be determined by comparison with the through rates. [Charlotte Shippers Assn. v. Railroad, 11 I. C. C. R. 108.]

Rates from St. Louis, Nashville, Chattanooga to Hampton, Fla., were higher than rates from the same initial points to Palatka, Fla., the distance to Palatka being greater than that to Hampton. The rates to Palatka were fixed to meet competition at that point.

No such competition existed at Hampton. Held that
the reasonableness of the Hampton rates were not to
be determined by comparison with the rates to Pa-
latka. [Interstate Commerce Commission v. Railroad,
120 Fed. 934, refusing to enforce order of Commission,
8 I. C. C. R. 503.]

The proportions received by the inland carriers
of through rates on import traffic from foreign ports
to inland points in the United States were considerably
lower than corresponding rates on domestic traffic
from ports of entry to the same inland points. The
through rates were controlled by competition at the
foreign ports. The commission, without considering
such competition, ordered the inland carriers to cease
carrying imported traffic at any other than the rates es-
tablished on domestic traffic. Held, that the effort of
the commission to deprive inland consumers of the ad-
vantage of through rates, thus to give an advantage
to traders and manufacturers at the large seaboard
cities, would seem to create a mischief which the act
was intended to remedy; that among the circumstances
and conditions affecting rates which the commission
should have considered, as well in the case of traf-
fic originating in foreign ports as that originating
within the United States, was competition; that the
acceptance of proportions of the through rates which
were lower than the corresponding domestic rates was
not an act of unjust discrimination. [Texas & P. Ry.
Co. v. Interstate Commerce Commission, 162 U. S. 197,
reversing I. C. C. v. Texas & P. Ry. Co.]

In deciding whether the proportions of through
rates on import traffic, accepted by the inland carriers
for haul from ports of entry to destination, were un-
lawful as compared with higher inland rates on do-
mestic traffic between the same points. Held, that the
commission should have considered the following facts:
That the acceptance of import traffic enabled the car-
riers to take advantage of the preponderance of empty

car movement from ports of entry, thus securing traffic for which *any rates* might be regarded as remunerative; that the through rates were affected by competition, both of ocean and inland carriers; that the through bills of lading furnished collateral for the transaction of business and took from the shipper and consignee the care as to intermediate charges and cost of handling, thus helping to swell the volume of business; that the tendency of the through billing was to eliminate the obstacles between producer and consumer. [Texas & P. Ry. Co. v. Interstate Commerce Commission, 162 U. S. 197, 206.]

The fact that a rate in one direction is materially higher than the rate on the same class of traffic over the same line between the same points in the opposite direction does not establish prima facie the unreasonableness of the higher rate. [MacLoon v. Railroad, 9 I. C. C. R. 642.]

The fact that a rate over a road or line in one direction is materially higher than the rate on the same class of traffic over the same road or line and between the same points in the opposite direction, does not, as in case of hauls over the same line in same directions, establish prima facie the unreasonableness of the higher rate. [Duncan v. Railroad, 6 I. C. C. R. 85, 103, 4 I. C. R. 385.]

Rate of 62 cents on "wool in the grease" was in effect from Philadelphia, Pa., to Fort Wayne, Ind. Rate on the same commodity from Fort Wayne to Philadelphia was only 34 cents. The movement of wool was almost wholly toward the East. Competition to secure east-bound traffic was therefore more intense than that resulting from efforts to secure occasional shipments to the West. On complaint that west-bound rate was unreasonable as compared with east-bound rate, held, that the circumstances were so dissimilar that the reasonableness of the former rate was not to

be determined by comparison with the latter. [Weil v. Railroad, 11 I. C. C. R. 627.]

Where, by reason of competition, rates to a longer distance point are lower than those in effect to a shorter distance point on the same line, the shorter distance being included within the longer, the reasonableness of the rates to the shorter distance point cannot be determined on mere comparison with those in effect to the longer distance point. [East Tennessee, V. & G. Ry. Co. v. Interstate Commerce Commission, 181 U. S. 1.]

The mere fact that rates to a longer distance point, which are controlled by competition, are reasonable, cannot be availed of as a ground for holding that rates to shorter distance points on the same line are unreasonable. [Interstate Commerce Commission v. Railroad, 88 Fed. 186, 195; affirmed 93 Fed. 83, 35 C. C. A. 217; 181 U. S. 29, refusing to enforce order of Commissioner, Rd. Com. of Ga. v. Clyde S. S. Co., 5 I. C. C. R. 324, 4 I. C. R. 120.]

As the petition in this case does not allege nor does the evidence disclose the fact that the shipments, mentioned in the petition, were all *similar,* and were made in the same *direction,* it fails to state a cause of action against the appellant, and the evidence fails to prove one, and for those reasons I believe the judgment should be reversed.

While dissenting in this case, I am not unmindful of the fact that Division No. 2 of this court has reached the same conclusion as those expressed in the opinion of VALLIANT, P. J., and while I feel like shrinking from the responsibility of running counter to the opinions of such eminent and experienced jurists, yet my sense of duty impels me to state the reason for the faith that is within me. So far I have devoted much time in trying to show why the majority opinion is not sound, and will now proceed to make a few observations regarding the opinion delivered by Division No. 2 in the case of McGrew v. Mo. Pac. Ry. Co., 177 Mo. 533.

The first criticism I have to offer to that opinion is directed at the following paragraph on page 544: "Another and cogent reason why section 1134 should not be held to have repealed section 1126 is, that the latter was passed in obedience to the mandate of the Constitution itself, in section 12 of article 12 of that instrument."

This paragraph of the opinion contains an erroneous statement of fact regarding the enactment of section 1126, Revised Statutes 1899. The opinion states that it was "passed in obedience to the mandate of the Constitution itself." Now, the Constitution was not adopted until the year A. D. 1875, and an examination of the Laws of 1872, pp. 69 and 70, will show that the act of which section 1126 is an exact copy, was passed by the Legislature of 1872, which was three years prior to the adoption of the Constitution. That being true, it cannot be contended that said section was enacted in obedience to the command of the Constitution.

I, therefore, take it that if the fact upon which that portion of the opinion is based is erroneous, then the opinion in that particular must necessarily be erroneous also. And again, the Act of 1872, from which section 1126 is a copy, was unconstitutional and void at the time of its passage, and could in no manner form a sound basis upon which to rest that decision. Nor can we escape that conclusion by saying that said act was re-enacted in 1879, for the manifest reason that it was repealed by the Act of 1887.

The second criticism I wish to suggest against that opinion is this: On page 543 the following language is used: "The first, or section 1126, Revised Statutes 1899, had and has for its object the regulation of freight charges *in any* direction, the same or opposite directions, on the same road and over *any portion* of the same road, regardless of 'circumstances or conditions,' and is in the language of the Constitution itself, article 12, section 12, supra; whereas section 1134, Re-

vised Statutes 1899, by its terms is limited to shipments over that part of the railroad '*in the same direction,* under similar circumstances and conditions,' and both can readily stand together.''   Now, that is clearly a misconception of the meaning of those two sections of the statutes.   The word ''any'' as used in section 1126 means *all,* and when that section declares it unlawful for a railroad company to charge a greater compensation for transportation of freight for a shorter than for a longer distance in ''any'' direction on ''any'' part of its road, it means that it is unlawful for the company to make such charge for such services in *all* directions over its road.   The word ''any'' as used in that section has the same meaning so far as directions are concerned as it has in a law or ordinance which declares it unlawful for a person to walk over a public flower garden in *any* direction, that is, walking in *all* directions over the garden is prohibited, and declared unlawful.   That being unquestionably true, and if section 1126 is still in force, as stated in that opinion, then a railroad company under section 1134 cannot make such charges for hauling like freight under *dissimilar* conditions, and in *opposite* directions, as is expressly authorized by that section, and the reason therefor would be, as heretofore stated, that section 1126 prohibits such greater charge for shipments in *all* directions; so it must logically follow that if section 1126 is still in force, then 1134 is not.   These two sections are irreconcilably in conflict with and repugnant to each other.   Yes, so much so, that if section 1126 is still in force, then the human mind can neither conceive nor state a case under section 1134 which would not violate section 1126.   If such a thing can be done, I would like very much to see that case stated.  Take the very facts stated in that opinion, and if section 1126 is in force, then defendant could not have interposed any defense whatever to it under section 1134,

230 Sup—39

regardless of the directions in which the shipments were made. In order to sustain that case, the court there said: "This court will take judicial cognizance that a shipment from Myrick to Kansas City was not in the same direction that the shipment from Myrick to Boonville was, but, in fact, was in an *opposite direction.*" Now, if that is true, and the fact that the shipments mentioned were in opposite directions fastened the liability upon the defendant in that case, then by parity of reasoning this court should in this case take judicial notice of the fact that shipments in this case from Myrick to Kansas City and those to Harrisonville are in the same direction so far as the line of railroad is concerned, and for that reason discharge the defendant in this case. But no, that cannot be done either, according to the opinion of Judge VALLIANT herein.

The effect of the two opinions is to find for Mr. McGrew, whether the shipments are made in the same or opposite directions. In either event the company must lose, yet, according to section 1134, it is entitled to win under the conditions stated therein, but under those two opinions those conditions can never transpire. It is, therefore, clearly seen that according to these two opinions section 1134, which is the later enactment, is repealed by section 1126, which is the prior enactment. I submit that in the very nature of things this cannot be done, and it is in conflict with the universal rule of construction, that where two statutes of different dates were enacted and are in conflict with each other, the one which was first enacted will be repealed by implication by the subsequent enactment and not vice versa.

Not only this, but by reading section 12 of article 12 of the Constitution, and section 1126, it will be seen that the opinion mentioned is in error when it says that section of the statute was enacted in pursuance to the very mandate of the Constitution, and is in the

language thereof. The language of the Constitution is as follows: "It shall not be lawful in this State for any railroad company to charge for freight or passengers a greater amount, for the transportation of the same, for a less distance than the amount charged for any greater distance." From this quotation it will be seen that said section 1126 is not only not in the language of the Constitution, but is much broader in its provisions than those of the Constitution. If said section 12 of the Constitution was as broad in its provisions as are those of section 1126, and as stated in that opinion "has for its object the regulation of freight charges *in any* direction, the same or opposite directions, on the same road and over *any portion* of the same road, regardless of 'circumstances or conditions,'" then unquestionably section 1134 would be clearly unconstitutional and void, because it permits a greater charge for a shorter haul than for a longer one, where the conditions are *dissimilar* and the shipments are in *different* directions.

I have thus attempted to show that section 1126 was not enacted in response to the mandate of the Constitution, as stated in that opinion, and that it is much broader in its terms than are the provisions of said section 12 of the Constitution, and, therefore, it did not and could not prevent the Legislature in 1887 from repealing that section and enacting in lieu thereof section 1134.

This entire trouble and litigation has grown out of the erroneous assumption that section 1126 was enacted in response to the mandate of the Constitution, and that it is in the language thereof, and in holding all other acts and statutes upon the subject to be in subordination to that section; whereas, in fact, it was enacted three years prior to the adoption of the Constitution, and was clearly unconstitutional at the time of its passage, as before shown; and notwithstanding it was re-enacted in 1879, it was clearly and unques-

tionably repealed by the Act of 1887, now section 1134, Revised Statutes 1899, which latter act expressly authorized the company to do just what the petition in the case charges it with doing, and is not, therefore, lawful.

V. Counsel for respondent finally contends that appellant cannot raise any constitutional questions in this court, because they were not presented to the court below. As a general proposition that is true, but where the sole cause of action arises out of the violation of a statute which is unconstitutional, and there can be no recovery except by giving that statute force and effect, then its constitutionality can be raised at any stage of the proceedings, and in any court where the cause is pending, at any time.

The reason for that rule is that if the statute is unconstitutional and void, and that is the only law upon which the case can be predicated, then there is no law creating a cause of action, and consequently there can be no recovery. [State ex rel. v. Smith, 177 Mo. 69, l. c. 92; State ex rel. v. Smith, 152 Mo. 444; Ex parte Siebold, 100 U. S. 371; State ex rel. v. Smith, 141 Mo. 1; Kaukauna Co. v. Green Bay Co., 142 U. S. 254; Kirkwood v. Meramec Highlands Co., 160 Mo. l. c. 118.]

I am, therefore, of the opinion that the judgment should be reversed and judgment entered here for appellant. *Fox, C. J.,* and *Burgess, J.,* concur.